Opinion of the Court—Burnett, J.

## STATE OF OREGON, RESPONDENT, *v.* THOMAS GARRAND, APPELLANT.

RES GESTÆ.—To make declarations a part of the *res gestæ* they must be contemporaneous with the main fact; but in order to be contemporaneous they are not required to be precisely concurrent in time.

EVIDENCE—ATTEMPT TO ESCAPE. —Evidence of attempts to escape by a prisoner is admissible and tends to establish guilt.

IDEM—DYING DECLARATIONS.—Dying declarations to be admissible must be shown to have been made under a consciousness of impending death, and respecting the cause of the death.

INSTRUCTIONS.—If, on a trial for murder, there is no evidence of facts and circumstances such as would, under the law, reduce the crime charged to manslaughter, the judge may so inform the jury.

GOOD CHARACTER.—Evidence of good character when offered by a prisoner ought to be submitted to the consideration of the jury together with the other facts and circumstances of the case, to be weighed by them with the other evidence in the case, in determining the guilt or innocence of the accused.

MURDER IN THE FIRST DEGREE—WHAT CONSTITUTES.—To constitute murder in the first degree, the killing must be done purposely and of deliberate and premeditated malice, or in the commission or attempt to commit rape, arson, robbery or burglary.

MURDER IN THE FIRST DEGREE—WHAT· DELIBERATION NECESSARY TO CONSTITUTE.—There is no length of time fixed by the law for the deliberation necessary to make an offense murder in the first degree, which would otherwise be murder in the second degree; but the evidence must show that the design to kill was formed in cool blood, and not *hastily* upon the occasion.

APPEAL from Marion County.

The facts are stated in the opinion of the Court.

*E. C. Bronaugh and John M. Gearin,* for Appellant.

*J. J. Whitney, District Attorney; J. J. Murphy and Boise &
Willis,* for Respondent.

By the Court, BURNETT, J.:

The defendant (appellant herein) was tried at the November term, 1874, of the Circuit Court for Marion County, for the crime of murder, in killing Thomas Hubbard, and found guilty. The case comes into this Court on appeal, on

exceptions to the ruling of the court below on the admission of evidence, and certain instructions given by the court to the jury.

The first objection is to the testimony of the witness Castleman, as to what the prisoner said soon after the shooting took place, where it was done.

This testimony was properly admitted.   Defendant's threat to shoot the witness for simply inquiring what was the matter, had a tendency to prove wickedness and malice in the transaction that had just before taken place.

To make declarations a part of the *res gestæ* they must be contemporaneous with the main fact, but in order to be contemporaneous they are not required to be precisely concurrent in time.   If the declarations spring out of the transaction, if they elucidate it, if they are voluntary and spontaneous, and if they are made at a time so near to it as reasonably to preclude the idea of deliberate design, they are then to be regarded as contemporaneous.   (*Mitcheson* v. *The State*, 11 Geo. 615.)

The next objection is that the court erred in admitting evidence that the prisoner attempted to escape.   This objection is not well taken.   Attempts to escape are always admissible, and if shown, tend to prove guilt.   (1 Whart. § 714.)

The next objection is to the admission of the testimony of Dr. Bailey, the attending physician, as to the declarations of the deceased after he was shot.

It is claimed, first, that no sufficient ground was laid for the admission of the statements of the deceased, as dying declarations.   Second, that the declarations themselves are not competent.

Upon the first point in this objection I would remark that it is certainly correct that the declaration must be made under a consciousness of impending death.   Mr. Wharton, in his excellent work on criminal law, gives several instances of cases in which such declarations have been rejected, as well as those that have been received.   The following case is very similar to the one at bar.   "A statement concluded with these words: 'I have made this statement

believing I shall not recover.' At the time it was made the deceased was in such a state that his death must speedily follow, and he died seven days afterward. But it appeared also that shortly before he made the declaration he had said to a constable, who asked him how he was, 'I have seen Mr. Booker, the surgeon, to-day, and he has given me some little hope that I am better, but I do not myself think I shall ultimately recover.'" Afterwards, on the same occasion, he said he could not recover. It ·was held that there was sufficient evidence that the statement was made under a consciousness of impending death to justify its reception in evidence. (1 Whart., § 673.)

In the case of *The People* v. *Lee* (17 Cal. 79), the court says: "There was sufficient foundation laid for the admission of the dying declarations of the deceased. Her wound was mortal and she appeared to be fully aware of her condition. She stated that she could not live, and requested her mother to send for a priest."

In the case at bar it appears that soon after the deceased was shot he said to Dr. Bailey, the witness: "Doctor, I am gone." Could there be a stronger expression of a consciousness of impending death? Men seldom think of the great event of death till its shadow falls across their own pathway, and when, for the first time, they realize the fact that their hold on this life is almost gone, that they must go out upon the great unknown sea, it is then, at that awful moment, that you can read the innermost thoughts of the soul by the agonizing expression of the lips, and it will be given in that language which habit has made common to the individual. It further appears that he told the witness twice afterwards that he did not think he would recover, making it a stronger case than either the case cited from Wharton or 17 Cal. It is further objected that deceased was in such a condition of mental aberration as to exclude his declarations, but the evidence goes no further than to show that deceased, at the time of making said declarations, had considerable fever and had taken an opiate, but it does not appear that either had affected his mind a particle, and the court cannot presume that he had become insane in the ab-

sence of any evidence of that fact.    Upon the second point it is proper to state that, under the rule laid down by Wharton, dying declarations are admitted from the necessity of the case to identify the prisoner and to establish the circumstances of the *res gestæ*, or to show transactions from which the death results.    This would seem to be the rule as laid down substantially by our own statute.    It is further said that they are not admissible to show old malice on the part of the prisoner toward the deceased, leaving the inference that they may be admitted to show the malice of the prisoner toward the deceased at the time of the transaction that resulted in the death of the deceased, and that they are a part of the *res gestæ*. (1 Wharton, § 670; 3 Greenleaf, §§ 15, 144.)

The following are the declarations objected to, as appears by the bill of exceptions: "The witness answered as follows: 'On the second or third day after the shooting, I said to the deceased, "Tom, is it true that after you were shot you were left alone in the store with Gerrand?"    He answered, "Yes."    I said, "And did he make you go on your knees and beg for your life, or he would shoot you dead?"    He answered, "Yes," very feebly, in a whisper.'"

The form and manner of these answers of deceased to the questions put by the witness is fully sustained by the case of the *Commonwealth* v. *Thomas Casey* (11 Cush., Mass. 417), and had a tendency to show how the death of Hubbard was brought about.    One of the inquiries before the jury was as to the grade of the offense committed by the prisoner, and the fact that after giving Hubbard the fatal shot he compelled him to get down on his knees and beg for his life, tended to show that Hubbard's death was not caused by the provocation that he gave the prisoner at the store, nor that the design in the prisoner's mind to take his life was formed hastily upon that occasion; it further tended to show that the prisoner was guilty of an act of brutality that could have only been born of deliberate and premeditated malice, and that the fatal shot previously given was the result of a design to take Hubbard's life, formed and matured in cold blood.

Human experience shows that, usually, passions suddenly excited soon subside.   The passion which could survive the fatal shooting, and which, so far from subsiding or giving way to remorse, in view of the crime it had committed, and of the agony and helplessness of its victim, is capable of the conduct described in these dying declarations, indicates more than a hasty purpose formed on the occasion.   The jury might, and perhaps we would be justified in saying that they ought to, infer a purpose to kill long formed from malice so deep seated.

The next objection is to that part of the charge to the jury which is as follows: "There is no evidence in this case tending to show in any event that the killing of Thomas Hubbard was done under such circumstances as to reduce the crime to the degree of manslaughter, and, under the testimony in this case, you can only find one of the following three forms of verdict:   1. Guilty as charged in the indictment; 2. Guilty of murder in the second degree; 3. Not guilty."

To ascertain whether this charge is erroneous or not it will be necessary to ascertain whether there was any evidence tending to establish the crime of manslaughter; if there was it was error in the court to give the instruction above set forth, for the jury are the exclusive judges of the facts and of the weight of the evidence; but if on a trial for murder there is no evidence of facts and circumstances such as would, under the law, reduce the crime charged to manslaughter, the judge may so inform the jury, and may charge them that they cannot consider the question of manslaughter. (27 Cal. 507.)

In the case last cited the instruction objected to is as follows: "In the case that is now being submitted to you there is no evidence on any points or matters given in proof which reduces the crime charged in the indictment to manslaughter; if the defendant be found guilty, therefore, you cannot consider the question of manslaughter upon the evidence in this case."

The Supreme Court of the State of California, in passing on this instruction, holds, that if the instruction assumed

to pass upon the weight of evidence, it was erroneous; on the other hand, if there was a total absence of all testimony as to such facts and circumstances as would, under the law, reduce the offense from murder to manslaughter, and the instruction is to be understood as declaring such to be the case, then it was not erroneous. Looking into the transcript in this case we see no evidence of facts and circumstances that would reduce the crime from murder to manslaughter. Error will not be presumed; it must affirmatively appear from the record. (*O'Kelly* v. *Territory of Oregon*, 1 Or. 51.)

The next objection is to the instruction in respect to the effect of proof of good character.

There is a great conflict in the authorities as to the effect of evidence of this kind, and there seems to be no well-settled and definite rule upon the subject. Many of the authorities cited go further than the court below did in its instruction on this point. To show the different views held on this subject I will refer to some of the authorities cited. Judge Deady, in the case of *United States* v. *Jacob Mayer*, instructed as follows, upon the question of good character: "One thing more as to character. Evidence has been introduced, by the defendant, to show that he had a good character for truth and veracity. Character is only important as evidence when a case is doubtful. No proof of good character, against plain proof of guilt, can be considered, because experience has shown that the best of men have fallen; but, in cases of doubt, if it appears that a man has had a good character in the community in which he has lived, the fact should be taken into consideration by you as a circumstance against the probability of guilt." (*United States* v. *Jacob Mayer*, 1 Deady, 138.)

The rule as laid down by Russell on Crimes is in the following words: "It has been usual to treat the good character of the party accused as evidence to be taken into consideration only in doubtful cases.  *  *  *  It is, however, submitted with deference, that the good character of the party accused, satisfactorily established by competent witnesses, is an ingredient which ought always to be submitted

to the consideration of the jury, together with the other facts and circumstances of the case." (2 Russell on Crimes, § 785; 3 Greenl. on Evidence, § 25.)

Admitting that the rule laid down in Russell to be correct, does the instruction on this point violate this rule? It is true that in the case cited from 43 N. Y. it is said by the court that evidence of good character will sometimes of itself create a doubt, when without it none would exist; but they did not go so far as to hold that proof of good character would create such doubts as to entitle the prisoner to an acquittal, against the other evidence in the case sustaining the charge. The case of *Cancemi* v. *The People* (16 N. Y. 16), as well as the celebrated case of the *Commonwealth* v. *Webster* (5 Cush., Mass. 295), are cited in the 43d N. Y. as sustaining that case; but neither of those cases go so far as the case in 43 N. Y.; and in fact that portion of the opinion in the case last referred to is to some extent *dictum*, for the instruction, upon which they were passing, held to be erroneous, is as follows: "It is only in cases where you have a well-reasoned doubt, a doubt logically arrived at, arising out of all the testimony, that evidence of good character steps in."

In the case of *The People* v. *Ashe* (44 Cal. 288), the instruction held to be erroneous is as follows: "Evidence of good character is entitled to no weight except in doubtful cases," etc.

The instruction objected to in the case at bar is as follows: "The legitimate effect, however, of evidence of previous good character, is not to screen a person from punishment for crime if his guilt be satisfactorily proved; but the legal effect of such evidence is only to strengthen and support any reasonable doubt which may exist in the minds of the jury as to the guilt of the accused, and it might have the effect in certain cases to raise a doubt, which would otherwise not be considered a reasonable one, to the standard of a reasonable doubt." We think the ideas conveyed by the language of this instruction are not contrary to the rule heretofore referred to as laid down by Mr. Russell in his work on crimes, and that it is sustained by the case in 16 N. Y., as well as the case in 5 Cushing.

The rule laid down in the 16 N. Y., above referred to, is as follows: "The principle upon which good character may be proved is, that it affords a presumption against the commission of the crime. This presumption arises from the improbability, as a general rule, as proved by common observation and experience, that a person who has uniformly pursued an honest and upright course of conduct will depart from it and do an act so inconsistent with it. Such a person may be overcome by temptation and fall into crime, but they are exceptions; the general rule is otherwise. The effect of this presumption from character will necessarily vary according to the varying circumstances of different laws. It must be slight when the accusation of crime is supported by the direct and positive testimony of credible witnesses, and it will seldom avail to control the mind in cases where the testimony, though circumstantial, is reliable, strong and clear. But in cases where the other evidence is nearly balanced, but slightly preponderating against the defendant, the presumption from the proof of good character is entitled to great weight and will often be sufficient to turn the scale and produce an acquittal."

In the case of the *Commonwealth* v. *Webster*, heretofore referred to, Chief Justice Shaw, in charging the jury upon this question of character, uses the following language: "There is one other point remaining to which it is necessary to ask your attention, and that is the evidence of character. There are cases of circumstantial evidence where the testimony adduced for and against a prisoner is nearly balanced, in which good character may be very important to a man's defense. A stranger, for instance, may be placed under circumstances tending to render him suspected of larceny or other lesser crime. He may show that, notwithstanding these suspicious circumstances, he is esteemed to be of perfectly good character for honesty in the community where he is known, and that may be sufficient to exonerate him. But when it is a question of great and atrocious criminality, the commission of the act is so unusual; so out of the ordinary course of things and beyond common experience, it is so manifest that the offense, if perpetrated, must

have been influenced by motives not frequently operating upon the human mind, that evidence of character and of a man's habitual conduct under common circumstances must be considered far inferior to what it is in the instance of accusations of a lower grade. Against facts strongly proved, good character cannot avail. It is, therefore, in smaller offenses, in such as relate to the actions of daily and common life, as when one is charged with pilfering and stealing, that evidence of a high character for honesty will satisfy a jury that the accused is not likely to yield to so slight a temptation. In such a case where the evidence is doubtful, proof of character may be given with good effect."

In fact, it seems to be somewhat difficult to conceive of a case in which there would not have to be some doubt or misgiving in the minds of the jury as to the truth of the charge made against the prisoner, upon the evidence independent of that of character, before proof of good character alone would justify them in finding a verdict of acquittal or reducing the grade of the crime, especially when we consider that the law clothes the prisoner with the presumption of innocence and good character to begin with, and juries are far more likely to be misled by being told that proof of good character alone is sufficient to create a reasonable doubt upon which a prisoner should be acquitted, than to be told that it is only where the other evidence is nearly balanced, but slightly preponderating against the defendant, that good character would be of any value. Evidence of good character, when offered by a prisoner, ought to be submitted to the consideration of the jury with the other facts and circumstances of the case, to be weighed by them with the other evidence in the case, in determining the guilt or innocence of the accused.

The next objection is to that portion of the charge contained in the following language: "To constitute the deliberation or malice aforethought, which the law contemplates as a necessary ingredient or element of murder in the first degree, it is not necessary that the purpose or intention, on the part of the accused, to take the life of Hubbard, had been formed or resolved upon for any particular length of

time prior to the killing; but it is sufficient if you are satisfied, beyond a reasonable doubt, from the evidence, at some time prior to the killing, the defendant, in cold blood, and without provocation to excite his passion, conceived in his mind, and resolved (either on condition that Hubbard would not pay him, or otherwise) to take Hubbard's life, and that defendant did, without justification, shoot and kill Hubbard—whether at the precise time of the shooting defendant was in a passion or not, the act would be murder in the first degree."

Our statute defines murder in the first degree in the following language: "If any person shall, purposely and of deliberate and premeditated malice, or in the commission or attempt to commit any rape, arson, robbery or burglary, kill another, such person shall be deemed guilty of murder in the first degree."

The rule, then, as laid down is, that to constitute murder in the first degree, the killing must be done purposely and of deliberate and premeditated malice, or in the commission or attempt to commit rape, arson, robbery, or burglary. No definite time has been fixed for the deliberation and premeditation necessary to make the crime murder in the first degree, which would otherwise be murder in the second degree; nor can there be in the very nature of things. Section 519 of the Criminal Code furnishes the only test on this subject, and that reads as follows: "There shall be some other evidence of malice than the mere proof of the killing to constitute murder in the first degree, unless the killing was effected in the commission or attempt to commit a felony; and deliberation and premeditation, when necessary to constitute murder in the first degree, shall be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cool blood, and not hastily upon the occasion."

In the instruction above referred to, the court told the jury, in substance, that in order to convict the prisoner of murder in the first degree, they must believe, from the evidence, that he had deliberately made up his mind, in cool blood, to kill Hubbard, and that he did kill him without

justification. It is a well-settled rule that the instructions to the jury must be applicable to the case made by the evidence; and as the evidence tended to show that the prisoner, on his way to the store where the shooting took place, formed the design to kill Hubbard, and when charged by Hubbard immediately before the shooting, in presence of the witnesses at the store, with threatening to kill him as they came there, admitted that he had, and there being no evidence tending to show that he had abandoned such design previous to the shooting, the instruction referred to, in the light of the testimony contained in the bill of exceptions, must be taken to be that the killing in this case, if not justifiable, was presumed to be in pursuance of the design previously formed to take Hubbard's life, and in this view of it we think the charge ought to be sustained.

There is another objection urged against that portion of the instruction last referred to, stating that it made no difference "whether at the precise time of the shooting defendant was in a passion or not." Of course the charge must be taken altogether; and reading it in that way, we do not think it is open to the objection urged against it. When we consider that under the statute, to reduce the crime from murder to manslaughter, the killing must be done without malice, express or implied, and without deliberation, upon a sudden heat of passion which must be caused by a provocation apparently sufficient to make the passion irresistible, and we further consider that in this case there was no evidence to reduce the crime to manslaughter, the defendant could not have been injured by that expression, for it is contrary to human experience that men should remain cool, and not exhibit any passion when they are taking the life of their fellow-man, though they may have coolly and deliberately made up their minds to do it, and it is only where there is a provocation, apparently sufficient to create a passion that is irresistible, that the passion that a party is in will cut any figure in reducing the grade of the crime.

The Supreme Court of California, in the case of *The People* v. *Bealoba* (17 Cal. 394), in construing a statute similar to ours, says: "The acts of homicide by poison, etc., carry

with them conclusive evidence of premeditation, and the jury would have no option but to find the prisoner guilty in the first degree, upon proof of the crime; but it does not follow that the same result should not flow when other proof of deliberation than that afforded by the circumstances existed; for the statute is express that *all other* kinds of deliberate, willful and premeditated murder is murder in the first degree. To fall within this class the crime must be premeditated, willful and deliberate." These adjectives are, as used, nearly synonymous.

The jury, in this case, under the instructions given by the court, and from the evidence, must have found that the prisoner formed the design to kill Hubbard before they arrived at the store, or at least for a sufficient length of time to deliberate on the subject, for, after being out some time, as appears by the bill of exceptions, they came into court and asked to hear again the charge of the court, in regard to the length of time which must elapse between the formation of the design to kill and the killing, to constitute deliberation and premeditation, and render the offense murder in the first degree.

The last objection made is to the following action: "The jury, after receiving the instructions of the court, and at about the hour of eight o'clock in the evening, before retiring to consider of their verdict, were informed by his honor, the judge of the court, that he would not adjourn the court for two hours, but would hold the court open awaiting their verdict, should they agree. At about the hour of eleven o'clock in the evening, his honor, the judge of the court, communicated to the jury, through the bailiff, a message that he was about to adjourn court for the evening; whereupon the jury, by message sent through the bailiff, requested of his honor that he would hold the court open for twenty-five minutes longer, and when the said period of twenty-five minutes had about elapsed, the jury, through the bailiff, requested of his honor, the judge of the court, that he would not adjourn the court for five or ten minutes more, which request was granted." Under our statute, the court clearly had a right to communicate with

the jury through the bailiff. (Civ. Code, § 200.) And unless there was an abuse of authority to the injury of the substantial rights of the appellant, the judgment will not be reversed on that ground.

In the case in 1st Pickering, the court had sent instructions to the jury, without the knowledge or consent of the parties to the action, and though that practice had been acquiesced in for a long time, the Supreme Court thought it had better be stopped. No doubt that was a correct conclusion, especially when we consider that their statute had no provision like ours, allowing a communication to be made upon the order of the court.

It does not appear that any substantial right of the appellant was injured by these communications. The court, in the case of *O'Kelly* v. *The Territory* (1 Or. 59), very properly said: "Time was when the unfortunate accused was dragged to trial without counsel or a fair chance for self-defense; then other rules prevailed, and courts tried to make technicalities the means of justice; but when a prisoner comes before our courts with more privileges and presumptions in his favor than he otherwise could have, these olden rules cease with the reasons on which they rested, and criminals cannot be allowed to take refuge from the judgments of our liberal laws in the cobwebs of an antiquated practice. The awful import of these views to the appellant is not forgotten; but criminal laws were made to prevent crime, and their firm enforcement by courts is a duty as plain as it is painful."

Judgment affirmed.