Argued October 26: decided December 21, 1896.

## STATE v. ELLSWORTH.
### (47 Pac. 199.)

1. CROSS EXAMINATION—HOSTILITY OF WITNESS.—A jury is entitled to know the bias of a witness and the extent to which his feelings are enlisted in a cause, so that they may fairly determine the weight to be given to his testimony, and for the purpose of ascertaining his opinion it is proper to ask on cross examination if he had not expressed a certain feeling or used a given expression concerning the case.

2. FOUNDATION FOR SHOWING HOSTILITY OF WITNESS.—The rule for laying the foundation is the same where it is intended to show the hostility of a witness as where it is intended to impeach him: *State v. Stewart*, 11 Or. 52, cited and followed. Thus, as a foundation for showing hostility of a witness to defendant, E., it is enough to ask if, in referring to failure of the jury to agree on a verdict at a former trial, the witness did not, at a certain time and place, ask his friend, a man about 60 or 65 years old, with a gray moustache, whose name was unknown to counsel, what he thought of the jury in the E. case, and, on his answering that he understood that they disagreed, say to him, "Well, that was better than an acquittal." This was sufficiently definite as to time, place, and persons present to refresh the witness' memory.

3. HOMICIDE BY POISONING—INSTRUCTIONS AS TO DEGREE OF GUILT. —Sections 1714 and 1727 of Hill's Code, considered together, do not provide that every death caused by poisoning shall be murder in the first degree, but only that the State must prove by some appropriate evidence, as, for example, by showing the giving of poison, or a waylaying, that deliberation and premeditation existed in the mind of the defendant when the deadly act was committed.

4. Homicide by Poisoning—Instruction as to Degree of Guilt.—
One charged with murder in the first degree by poisoning is not
entitled as a matter of law to have the jury instructed to convict
as charged or acquit. If there is any evidence tending to raise a
doubt as to the intent with which the act was done, the convic-
tion should be for a lower degree only, and evidence of good
reputation is sufficient for that purpose. Thus, where deceased
died in a convulsion soon after defendant administered what he
claimed was a powder of corn starch, and strychnine was found in
her stomach, and experts said she died of strychnine poison,
though there was no evidence that strychnine was kept by defend-
ant or deceased, from which it might be inferred that he admin-
istered it by mistake, yet, he having offered proof of his general
reputation for peace and good order, tending to raise a doubt as
to the intent with which the act was done, if done by him, it was
proper to instruct on manslaughter.*

From Multnomah: Thos. A. Stephens, Judge.

Appellant W. E. Ellsworth was on the 20th day of
February, 1895, indicted by the grand jury of Multnomah
County for the crime of murder, by administering to his
wife, Edith Ellsworth, strychnine. To this indictment he
pleaded not guilty; a trial was had which resulted in a
disagreement of the jury, and afterwards a second trial
was had, when the jury returned a verdict of guilty of
manslaughter.

The record shows that the defense was based wholly
on scientific propositions, and the evidence was therefore

* The instruction here given was as follows: "If you shall
believe from the evidence in this case, beyond a reasonable
doubt, that the prisoner at bar on the 9th day of February,
1895, in this County and State, was engaged in the commission of a
lawful act, that is to say, that he was engaged in administering unto
said deceased, Edith Ellsworth, what he honestly believed to be a
harmless powder, and without due caution or circumspection he ad-
ministered to her, the said Edith Ellsworth, a dose of strychnine
poison instead; and you shall further find that from the effect of said
strychnine poison so administered by defendant to the said Edith
Ellsworth she died in this County and State within a year; or if you
shall believe from the evidence in this case, beyond a reasonable doubt,
that the defendant at bar through culpable negligence on his part
administered to said Edith Ellsworth strychnine poison from the effect·
of which strychnine poison she died in this County and State within
one year, that I charge you in either case as I have instructed you the
law to be, will constitute the crime of manslaughter, and you shall so
find by your verdict."—Reporter.

largely of a scientific nature. The deceased was a woman of highly nervous, hysterical temperament, who was addicted to the use of morphine, was afflicted with frequent nervous headaches which resisted treatment, and had become habituated to the use of and dependent upon medicine. A short time before her death she had had a miscarriage, and at the autopsy her womb was found to be enlarged and spongy, and to contain a portion of the placenta, pus, and mucopus. The record discloses testimony tending to prove a conversation between deceased and appellant to the effect that appellant was to obtain from the doctor some medicine to increase the flow, and that in the evening when she had asked him for the medicine, rather than tell her that he had not considered it necessary that she should have the medicine, and thereby incite a nervous condition, he went into the pantry, prepared a powder of corn starch, and gave it to her, at seven o'clock, while she was in bed, telling her that it was the medicine which the doctor had sent her. It also appears he had resorted to this or similar subterfuges before, to her relief. Soon after taking the powder, she commenced to have a "jerky" feeling, which soon ripened into convulsions, and before the doctor arrived, at two o'clock in the morning, she had had several; after the doctor arrived and before her death she had three convulsions, all tetanic in character, all about equal distance apart, and of about equal severity and duration. She died in a convulsion at a quarter before five, nine hours and forty-five minutes after the taking of the powder.

The main defense was that had this powder given to her by appellant been strychnine, and there is no evidence in the record of any other substance having been given to her by him, she should have died at thirty minutes after eight, and she could not have lived longer than half-past twelve, dying in convulsion, and that the convulsions

would increase in frequency, severity, and duration; and scientific authorities were cited to show, and physicians were called to prove, that no case has ever been recorded or heard of where a person who had taken a lethal dose of strychnine lived longer than five and one-half hours, the patient dying in convulsion. Indeed, it was shown that there is only one case recorded where the patient survived so long, most of them dying within one and one-half hours; hence the impossibility of this crime having been committed as charged in the indictment, and suggesting the possibility that she may have died from toxic causes other than strychnine, e. g., septicaemia or ptomaines.

The chemist who performed the analysis of the stomach, a witness for the state, produced in court a bottle containing a solution, which he testified was the residue obtained from his analysis, that he had performed on a portion of the solution the test for strychnine, which consisted in evaporating in a white porcelain dish a few drops to dryness, and then adding a few drops of sulphuric acid, and then adding a small particle of bichromate of potash; on adding the bichromate of potash a rotation of colors should be produced, first blue, changing quickly into violet or purple, then to pink, then to red, and then to yellow, and, after about an hour, into dirty green. These colors, when obtained in this rotation from a solution so treated, prove, witness says, that the solution contains strychnine. The state offered by this witness to perform the test for strychnine on a portion of this solution in the presence of the jury. There being no objection interposed on behalf of appellant, witness proceeded with the test down to obtaining the color "yellow," witness telling the jury that the color "dirty green" would manifest itself in about an hour. The dish was then offered in evidence by appellant, and received and thereupon removed from the view of the

jury. In about an hour counsel for appellant moved the court that the dish be produced and shown to the jury in order that the jury might note the presence or absence of the color "dirty green." The court denied the motion. On a subsequent day, when appellant was offering evidence on the defense, the court offered appellant the privilege of reproducing the color test, which the appellant declined. This appellant claims was error, for the reason that the color "dirty green" is not a color in the rotation produced in this test, but that "yellow" is the terminal color given by all authorities, and testified to by all other scientific witnesses who testified in the case, the substance then fading to no color; and, therefore, if the dish had been exhibited to the jury when called for, it would have shown the absence of the color "dirty green," and hence would have had a tendency to establish either the unreliability of witness' testimony, or the absence of strychnine, if his testimony was believed.

The record discloses another defense which was relied upon somewhat, namely, want of care in the custody of the stomach, and in making the analysis. The stomach when removed was placed in a Mason fruit jar, which was not known to be clean, the top was screwed down but not sealed, and the contents of the jar was not known to have not been tampered with between that time and the time when it was handed to the chemist for analysis. The chemist who made the analysis did not examine the chemicals used for impurities, using always chemicals labelled "chemically pure," hence appellant claimed that the result obtained could be but doubtful, was based on information and belief, was hearsay, and therefore not evidence. The other errors relied upon were in sustaining objections to questions propounded by appellant to witnesses for the state for the purpose of showing bias and amount of bias existing in their minds, and in ordering witnesses not to answer

those questions, no objection having been interposed; and in charging the jury that they might return a verdict of manslaughter in this case, there being no evidence of an accidental giving. A motion for a new trial having been overruled, judgment of the court was passed upon appellant, he being sentenced to imprisonment in the penitentiary for the period of fifteen years, and to pay a fine of $1,000, from which he appeals.

REVERSED.

For appellant there was a brief and an oral argument by *Messrs. John R. Stoddard*, and *John C. Leasure.*

For the State there was a brief by *Mr. Wilson T. Hume*, with an oral argument by *Messrs. Cicero M. Idleman*, Attorney-General, and *Charles F. Lord*, District Attorney.

Opinion by MR. CHIEF JUSTICE MOORE.

1. The record discloses that at the trial, one Frank C. Middleton, a newspaper reporter, being called as a witness by and having given material evidence for the state, testified on cross-examination that he had talked considerably about the case; that he had a very decided opinion about it, and had expressed such opinion to others; and, referring to counsel for defendant, said: "I have expressed it to you, Mr. Leasure, and also to Mr. Sears." Mr. Leasure, for the purpose of showing the bias of the witness, asked him the following questions: "Do you remember at any time making an expression to me that he was as guilty as hell?" "Did you ever state to Mr. Alfred Sears, counsel in this case, that you thought the defendant ought to be hung?" The court, referring to the first question, and without objection from counsel for the state, said to the witness: "You need not answer it," and sustained an objection to the other question. The

defendant excepted to this remark and ruling, and now contends that he was thereby denied the right of showing to the jury the prejudice of the witness.   It will be observed from an examination of the testimony of the witness, that as to the merits of the case he had a decided opinion, which he expressed to others, but the jury were not informed as to whether such opinion was in favor of or opposed to the accused, and hence were left in doubt as to the degree of credibility to be accorded to his evidence.   It might seem that the question as propounded to the witness did not sufficiently call his attention to the time, place, and circumstances when it is assumed he expressed the opinion to Mr. Leasure.   The object of this requirement in connection with such questions is to enable the witness to revive in his memory the particular circumstance of which inquiry is made; but, this witness having stated that he had expressed an opinion to Mr. Leasure and Mr. Sears, the necessity of calling his attention to these preliminary facts was obviated, and the question to be considered is whether the refusal of the court to permit the witness to answer the question was the denial of a substantial right to the prejudice of the defendant.   Prof. Greenleaf, in his work on Evidence (Vol. 1, § 450), in speaking of the right of a defendant in a criminal action to inquire as to the bias of a witness called by his adversary, says:   "It has been held not irrelevant to the guilt or innocence of one charged with a crime to inquire of the witness for the prosecution, in cross examination, whether he has not expressed feelings of hostility towards the prisoner."

In *Starks* v. *People*, 5 Denio, 106, the plaintiff in error being on trial for arson, one E. Perkins appeared as a witness for the prosecution, and on cross-examination was asked whether, at a certain time, in speaking to one James Dunton, of the prisoner, and referring to a certain black

ash swamp, he had not said: "There would be a good place to kill Starks." The witness having answered in the negative, Dunton was called on the part of the accused to prove that Perkins had made use of the language attributed to him; but, an objection to the question having been sustained, and an exception allowed, the prisoner appealed upon being convicted and sentenced, and BEARDSLEY, C. J., in reversing the judgment, says: "How much, if anything, the evidence of the witness Dunton would have amounted to is not for us to say, but it was clearly competent, and should not have been rejected by the court. It tended more or less to show ill will or malice on the part of the witness towards the prisoner on trial, and was therefore pertinent and material. It is always competent to show that a witness is hostile to the party against whom he is called; that he has threatened revenge; or that a quarrel exists between them. A jury would scrutinize more closely and doubtingly the evidence of a hostile than of an indifferent or friendly witness. Hence it is always competent to show the relations which exist between the witness and the party against, as well as the one for, whom he was called. The inquiry is material, and goes directly to the credit of the witness in the particular case." In *People* v. *Wasson,* 65 Cal. 538 (4 Pac. 555), the defendant being on trial for murder, one Thomas Carroll was called as a witness for the prosecution, and on cross examination was asked the following question: "I will ask you now, Mr. Carroll, if on Saturday evening, in Pike Payne's saloon, in the town of Red Bluff, in the presence of Mr. McGowan and Mr. Thatch, both witnesses in this case, you did not make the remark that Wasson (the defendant) ought to have been hung before he felt Butte Creek?" An objection to this question having been sustained and an exception allowed, the defendant was found guilty, and the court, in reversing the judgment, and

quoting from the opinion in *People* v. *Benson*, 52 Cal. 380, say: "It is difficult to see on what ground this evidence was excluded, as it is perfectly well settled that on cross examination a witness may be interrogated as to any circumstance which tends to impeach his credibility by showing that he is biased against the party conducting the cross examination, or that he has an interest in the result adverse to such party. No citation of authorities is needed on a point so well settled, and the ruling was obviously erroneous." In the case at bar the jury were entitled to know what opinion the witness had expressed, that they might be able to judge of the weight and credibility to be given to his testimony, and the refusal of the court to permit the question to be answered was clearly erroneous, and the denial of a substantial right.

2. Dr. H. W. Cardwell, the physician who was at the death bed, was also called as a witness by the state, and gave material evidence against the defendant, and on cross examination by Mr. Stoddard was asked if, in referring to the failure of the jury to agree upon a verdict at a former trial of this action, he did not, at a certain time and place, ask his friend, a man with a gray moustache, and whose age was about sixty or sixty-five years, but whose name was unknown to counsel for the defendant, "What do you think of the jury in the Ellsworth case?" and upon his answering, "Oh, I understand they have disagreed," did you not then say, "Well, that is better than an acquittal"? An objection to this question having been sustained, the defendant excepted, and now insists that the language attributed to the witness shows hostility to the defendant, and that the person to whom the question was propounded and the remark made was sufficiently identified to revive in the memory of the witness the conversation to which his attention was directed. The rule is well settled in this State that before the hostility of a

witness can be shown by proof of unfriendly remarks or implicatory acts, such proof must be laid by calling his attention to the time, place, and persons present when the words or acts attributed to him were uttered or .done, that he may refresh his memory, and be afforded an opportunity for explanation: *State* v. *Stewart,* 11 Or. 52 (4 Pac. 128). The name of the person to whom the remark was made is not given, but that, if unknown to counsel, could be of little consequence, if the circumstances were detailed with that degree of particularity that necessarily called attention to the language or act complained of, and revived them in the memory of the witness: *Pendleton* v. *Empire Stone Dressing Co.,* 19 N. Y. 13. Viewed by the rule laid down in that case, we think the question must have accomplished this purpose, and, if the answer should be in the affirmative, it would tend to show bias, the remark being more than the mere expression of an opinion as to the guilt of the accused, in which case it was the duty of the court to permit the question to be answered: *People* v. *Lee Ah Chuck,* 66 Cal. 662 (6 Pac. 859).

3. Counsel for the defendant insist that under the evidence submitted the jury were compelled, either to find him guilty as charged in the indictment, or not guilty, and that the verdict rendered is equivalent to an acquittal; and, this being so, the judgment should be reversed, and the cause remanded with instructions to discharge the prisoner. In invoking this principle of law, counsel assumes that the jury must have found that the deceased died from the effects of poison administered by the defendant, and hence the use of the means adopted manifests such a degree of deliberation and premeditation as to show conclusively the existence of malice, from which the jury must have found him guilty of murder in the first degree; and that, if they could not so find, it was their duty to acquit him. Such an instruction having

been requested, it is claimed the court erred in charging that he might be convicted of manslaughter. Except in the commission of or attempt to commit rape, arson, robbery, or burglary, the killing of another, to constitute murder in the first degree, must have been done purposely and of deliberate and premeditated malice: Hill's Code, § 1714. And it is further provided that "There shall be some other evidence of malice than the mere proof of the killing to constitute murder in the first degree, unless the killing was effected in the commission or attempt to commit a felony; and deliberation and premeditation, when necessary to constitute murder in the first degree, shall be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cool blood, and not hastily upon the occasion": Code, § 1727. It is not the mere intent to kill, but rather the manner and circumstance of the killing, coupled with the intent, that renders the act malicious. "The fact that a killing was intentional," says BIGELOW, C. J., in *State* v. *Vaughan* (Nev). 39 Pac. 733, "does not necessarily prove that it was done with malice; for an intentional killing may be entirely justifiable, as where it is done in necessary self-defense, or it may be only manslaughter, as where it is done in the heat of passion caused by a sufficient provocation. What it is must depend upon the manner of the killing and the surrounding circumstances." The intention to take the life of another by poison presupposes that the substance adopted to carry the evil design into execution can be administered to the victim without the latter's knowledge, and the mere intent to take life by this means, when death ensues, evinces such deliberation and premeditation as to establish conclusively the existence of malice.

But can it be said that proof of death by poison conclusively implies that the substance producing such result was administered with intent to take life? If this ques-

tion be answered in the affirmative, then it follows that the physician who prescribes a toxic remedy in ordinary doses for the relief of his patient, the druggist who compounds it, and the friend of the deceased who knowingly administers it, are each equally guilty of murder in the first degree, providing the patient, possessing some unknown constitutional idiosyncrasy, die from its effects, although the same medicine, when given to others less susceptible to its influences, would prove a mild tonic or gentle stimulant. The mere statement of the consequences dependent upon the adoption of such a legal proposition ought to prove its own refutation, for, if such a rule could be invoked, heroic treatment in dangerous cases could never be adopted by the most skillful physician. In cases of death by other means, courts have said, in effect, that homicide by poison carries with it conclusive evidence from which a jury would have no option but to find the person administering the substance guilty of murder in the first degree: *People v. Bealoba,* 17 Cal. 389; *State v. Millain,* 3 Nev. 409; *State v. Garrand,* 5 Or. 216; *Aguilar v. Territory* (N. M.), 46 Pac. 342; *Territory v. Padilla,* 46 Pac. 346. The language here used was adopted by way of illustration only, and to show that death by other means than poison did not necessarily imply deliberation and premeditation, and hence was not evidence of malice, but the dictum not having been used in cases of death by poisoning can have but little weight in the case at bar. In *Commonwealth v. Dougherty,* 2 Browne (Pa.) Append. 18, it is said that in murder by poison the intention is of the essence of the crime. So, too, in *Commonwealth v. Keeper of the Prison,* 2 Ashmead, 227, it was held that to constitute murder in the first degree by poison the killing must have been willful. In Pennsylvania, under a statute which provides that the jury in the trial of a person indicted for homicide shall, in case of conviction, find whether it is murder in

the first or second degree, it has been held error in the trial of a person accused of murder by poison to charge the jury that if they found the defendant guilty, their verdict must be of murder in the first degree: *Lane* v. *Commonwealth,* 59 Pa. St. 371; *Shaffner* v. *Commonwealth,* 72 Pa. St. 60 (13 Am. Rep. 649); *McMeed* v. *Commonwealth,* 114 Pa. St. 300 (9 Atl. 878). Such also would seem to be the rule in Connecticut: See *State* v. *Dowd,* 19 Conn. 387. In these cases, however, it may well be doubted if the question at bar as involved, for, in *Commonwealth* v. *Dougherty,* 2 Browne (Pa.) Append. 18, the defendant was tried for a homicide committed with an ax, while *Commonwealth* v. *Keeper of the Prison,* 2 Ashmead, 227, was a proceeding by habeas corpus to admit to bail persons held for trial upon a charge of murder by administration of poison. The decisions in the other Pennsylvania cases proceed upon the theory that the instructions complained of took from the jury the consideration of a question which was solely within their province.

In *Ann* v. *State,* 11 Humph. 159, the plaintiff in error. a female slave, aged about fifteen years, being convicted of murder in the first degree in killing an infant about five wekes old, by administering laudanum to it, to produce sleep, appealed, and McKINNEY, J., referring to 4 Blackstone's Commentaries, 199, and Foster's Crown Law, 261, in reversing the judgment, says: "If, as Blackstone says, the poison were willfully administered, that is, with intent that it should have the effect of destroying the life of the party; or if, in the language of Foster, the act were 'done deliberately and with intention of mischief, or great bodily harm,' and death ensue, it will be murder. But if it were not willful, and such deliberate mischievous intention do not appear, and the act was done heedlessly and incautiously, it will be only manslaughter at most." In *State* v. *Wagner,* 47 Am. Rep. 131, HOUGH, C. J., in commenting

upon the question, says: "Poison may be carefully and innocently administered for a lawful purpose, and yet may produce death, in which case no crime will have been committed. So, also, a homicide committed by poison heedlessly or incautiously administered for no unlawful purpose will amount, at most, only to manslaughter. But where poison is knowingly administered with intention of mischief, and to accomplish some unlawful purpose, if death ensue it will be murder, although death was not intended." In *Bechtelheimer* v. *State*, 54 Ind. 128, it is held that a purpose to kill is an ingredient of the crime of murder, when the killing is effected by the administration of poison. To the same effect also, see the case of *Robbins* v. *State*, 8 Ohio St. 131. The decision in that case is questioned in *State* v. *Brown*, 7 Or. 186, in which KELLY, C. J., says: "When a homicide takes place in the commission of a robbery, it is not necessary, in order to constitute murder in the first degree, that the one perpetrating it should purposely kill the person slain, and where purpose is not required to constitute the crime, it need not be alleged in the indictment," but the criticism does not go to the question of homicide by poison. In *State* v. *Wells*, 61 Iowa, 629 (47 Am. Rep. 822, 17 N. W. 90), which was a trial for murder committed by a prisoner in the penitentiary by administering chloroform to one of the guards of that institution, the Supreme Court of Iowa seems to have reached a different conclusion. SEEVERS, J., in rendering the decision, says: "We are unable to draw a distinction between a homicide which occurs during the perpetration of a robbery, and when the homicide is caused by the administration of poison. Both, under the statute, must be deemed murder." In *People* v. *Harris*, 136 N. Y. 423 (33 N. E. 65), GRAY, J., in speaking of the issues to be tried under an indictment charging murder by administering poison, says: "The two questions which, upon all the

circumstances detailed in the evidence, the jury had to pass upon in coming to their verdict were, in the first order, whether the deceased came to her death by morphine poisoning, and, having determined that in the affirmative, then whether the defendant was guilty of the charge of having administered it to her with a deliberate intent to cause her death thereby." And in this State it is provided by statute that in all cases of murder in the first degree, except in the commission or attempt to commit certain felonies therein enumerated, it is incumbent upon the state to allege in the indictment and prove at the trial that the killing was purposely done (Hill's Code, § 1714); and, this fact having been established, proof that it was accomplished by poison shows such deliberation and premeditation as evince murder in the first degree: Code, § 1727.

4. An indictment for the crime of murder in the first degree necessarily involves all other grades of homicide which the evidence tends to establish. The state, in preferring its charge, may carve out and allege in the indictment any degree of crime that the grand jury may consider the defendant guilty of, but at the trial he may be found guilty of any crime the commission of which is necessarily included in that with which he is charged in the indictment, or of an attempt to commit such crime: Hill's Code, § 1383. The evidence introduced tended to show that the deceased died in a tetanic convulsion soon after the defendant administered to her what he claims was a powder composed of corn starch; that, an autopsy having been made, and Mrs. Ellsworth's stomach removed, an analysis of its contents revealed the presence of strychnine; and that several physicians, as experts, in answer to a hypothetical question predicated upon her symptoms and the discovery of poison in her stomach, say the deceased died of strychnine poison. Here was evidence to

warrant a finding that she died by this means, and, this fact having been established, the jury were compelled to ascertain whether the defendant administered the poison, and, if so, to find with what intent or under what circumstances it was given. In *State* v. *Garrand,* 5 Or. 216, it is held that if on a trial for murder there is no evidence of facts and circumstances such as would, under the law, reduce the crime charged to manslaughter, the judge may so inform the jury, and may charge them that they cannot consider the question of manslaughter. So too in *State* v. *Whitney,* 7 Or. 386, Kelly, C. J., says: "We do not undertake to say that when certain facts have been testified to, the court may not say to the jury that if they believe the testimony to be true, they should find the accused guilty of murder in the first degree." In 1794 the rule was announced in Pennsylvania that every unlawful killing was ·presumed to be murder, unless the person accused could show such circumstances as would reduce it to a lower degree of homicide (*Pennsylvania* v. *McFall,* Add. 255); but in a later case it was held that, although malice was presumed till the want thereof was shown, yet an unlawful killing, though it may be presumed murder, will not be presumed murder in the first degree: *Pennsylvania* v. *Lewis,* Add. 279. In 1845, Wilde, J., in a dissenting opinion in *Commonwealth* v. *York,* 9 Metc. (Mass.) 93, criticised this doctrine, and maintained that in criminal cases the burden of proof is on the prosecution throughout to make out the whole case. Since that time the reason assigned in this dissenting opinion is fast becoming the settled rule of law in this country, and seems to have been approved in *State* v. *Whitney,* 7 Or. 386, for it is there said: "The plea of not guilty was a continuous denial of every allegation in the indictment, and every statement of the witnesses who testified against him." In the case at bar, the defendant not having admitted the killing,

the presumption of his innocence controverted all evidence introduced by the state, and tended to disprove every grade of crime embraced in the indictment, and put in issue by the plea of not guilty; and, while no evidence was introduced tending to show that any strychnine was kept by the defendant or his wife, from which an inference might be drawn that in giving what he supposed to be corn starch he thereby carelessly administered a poison, yet he offered proof of his general reputation for peace and good order which tended to raise a doubt as to the intent with which the act was done, and aided the jury in ascertaining the probable degree of his guilt (*Carroll* v. *State*, 3 Humph. 315), from which, if it appeared to them that he had committed a crime, and there was reasonable doubt as to which of two degrees he was guilty, he could be convicted of the lower degree only (Hill's Code, § 1359); and, as the mere proof of death by the administration of poison does not necessarily imply an intentional killing, and there being evidence introduced at the trial tending to reduce the grade of homicide, it follows that there was no error in giving the instruction of which the defendant complains. By reason of the court's refusal to permit the witnesses Middleton and Cardwell to answer the question propounded to them, the judgment will be reversed, and the cause remanded for a new trial, and it is so ordered.

REVERSED.