THE STATE v. ROBERT TUCKER, Appellant.—96 S. W. (2d) 21.

Division Two, June 30, 1936.

102

*Leo Rassieur, Jr.,* and *Sigmund M. Bass* for appellant.

*Roy McKittrick,* Attorney General, and *Wm. Orr Sawyers,* Assistant Attorney General, for respondent; *Aubrey R. Hammett, Jr.,* Special Council.

LEEDY, J.—At the April, 1935, term of the Circuit Court of the City of St. Louis, appellant was convicted of manslaughter, predicated upon a charge of carelessly, recklessly, and with culpable negligence operating an automobile, whereby one Marsh Floyd was struck and killed. His punishment was fixed at a term of one year in jail and a fine of five hundred dollars, and he appeals.

The four points briefed by appellant, and relied on for a reversal relate to (1) the sufficiency of the evidence; (2) the giving and refusal of instructions; and (3) alleged improper argument on the part of the State.

The deceased, a pedestrian, met his death while crossing Lindell Boulevard in St. Louis in the early morning hours—about five-thirty —on Sunday, January 21, 1934. Lindell Boulevard runs east and west, and at 4500 west is intersected by Boyle, which runs north and south. The first street west of Boyle is Newstead, and at the intersection of the latter with Lindell, the Cathedral is located. The first street east of Boyle is Whittier. There was a white line marking the center line of Lindell. At the hour in question it was dark, and the street lights were on, and the pavement was dry.

The State's case was made out by the testimony of five witnesses, and an admission as to the testimony of an absent witness. Such absent witness was the autopsy physician, as to whom it was admitted that, if present, he would testify he performed an autopsy on the body of deceased, Marsh Floyd; that deceased appeared to be a white male, about forty years of age, about five feet eight inches tall, weighed about one hundred and thirty pounds, dark

hair, and from external appearance, was fairly well nourished. As to his injuries and cause of death, it was stipulated the doctor would testify: "Fractures both legs above ankles; fracture of right wrist; bruises and lacerations about body; scalp lacerated; skull opened—no hemorrhages—no fractures; spine and spinal cord: Fracture 3-4 cervical vertebrae and spinal cord torn; abdominal cavity filled with blood; peritoneum, lacerations; liver crushed and torn; spleen crushed and torn; and that the cause of death was broken cervical vertebrae with cord injuries, ruptured liver and spleen and abdominal hemorrhages."

Sally Miles testified that in January, 1934, she lived at 4315 Lindell Boulevard, St. Louis, Missouri; that she was a clerk at the Statler Hotel tobacco stand; that she had known Marsh W. Floyd about seven years; that on the early morning of January 21, 1934, Floyd called for her at 4315 Lindell for the purpose of taking her to six o'clock mass at the Cathedral in the next block, but that Floyd complained of feeling ill and decided to return home; that she was due to report to work at the Hotel Statler at seven o'clock that morning; that Floyd went out the front door and started down the street to cross; that she watched him, as she had previously done, it being her custom to wave to him when he reached the other side of the street; that Floyd lived at 4337 Laclede; that 4315 Lindell was a large residence that had been turned into a hotel and was on the north side of Lindell; that 4315 Lindell was about a hundred feet west of Boyle; that as Floyd started to cross from the north to the south side of Lindell she saw two cars pass by, going east on Lindell, and at that time she was in the window; that prior to that time she had ridden in automobiles and observed the speed of different cars at different times; that she could not answer exactly as to the speed of these two cars, but that to her they were going very fast, "terrific to me,"—in her opinion about sixty miles per hour. That she then heard a terrible impact and he disappeared; that when she heard this impact she ran into the street, found some shoes on the north side of Lindell, east of Boyle, and found Floyd's body between the center line and the north side of Lindell, about seventy-five or a hundred feet east of Boyle; that Floyd had been struck on the west side of Boyle; that when she saw Floyd on the ground he was unconscious and "the lower part of his limb was hanging loose, the blood was running out of the side of his head, and his eyes were half closed and his mouth half open, and I didn't know then he was dead."

On cross-examination she testified that she and Floyd lived about two blocks from each other and had been keeping company for about four years; that on the morning of January 21, 1934, which was a Sunday, she looked at the clock in the lobby as she came down to wait for Floyd, and it was a quarter after five; that Floyd left

about five-thirty; that she and Floyd frequently went to church together; that Floyd was not accustomed to drinking; would take a drink occasionally, but that she never knew him to be intoxicated or under the influence of liquor; that on this particular morning she detected no odor of liquor about him; that they had arranged this meeting on the preceding day, about four o'clock in the afternoon, but that she had not heard from him since that time; that when Floyd left she was following him with her eye, and that when she first saw the two automobiles they were passing the lobby window; that she was looking in a southeastwardly direction at the time; that it was dark at that time and the street lights were on; that she could not describe the cars which she saw, but that one looked larger than a roadster, but that she could not tell about the other one; that the two cars seemed to be even; that she could not tell whether either of these cars was a business vehicle; that she was in such a state of mind that night that the police sent her to the hospital; that she just looked at the cars, heard this terrific impact, Floyd disappeared and she ran out the front door; that she did not see any automobile strike Floyd and could not tell which of the two cars hit him; that she does not remember stating at the coroner's inquest on January 22, 1934, that she did not see the machine before Floyd was struck, but that if she made that statement, she presumes it is correct as her memory was clearer at that time than now; that she had never driven an automobile, was not a very good judge of speed in miles per hour; had never watched the speedometer on a car going sixty miles per hour, but that she had done a great deal of automobile riding around the city.

Ben Owens and his wife, Muriel, testified for the State. He was a buyer and department manager for Famous-Barr Company. They lived at the Gatesworth Hotel. They had had breakfast downtown, and were enroute to their hotel. There were no other passengers in their car. Mr. Owens was doing the driving. They were proceeding west on the north side of Lindell, and were approaching the intersection when and where deceased was struck. Mrs. Owens testified that when their car was about one hundred feet west of Whittier, she noticed two cars coming east on the south side of Lindell, and that they were in the block between Boyle and Newstead; that her attention was attracted by the speed of the two cars, which in her opinion, was between fifty and sixty miles per hour; that the two sets of headlights seemed to be staying fairly even—that is, abreast; that as these cars approached, she turned to her husband, and at that time heard a crash, and the two cars were then at the intersection of Boyle and Lindell—on the south side of Lindell, and on the west side of Boyle. She then saw ''an object come hurling through the air, and it dropped directly in front of our car—possibly twenty-five

or thirty feet in front of our car," and the minute it hit the pavement she realized it was the body of a man. Her cross-examination was directed largely to the question of her ability to accurately judge the speed of an approaching automobile when viewed from a car traveling in the opposite direction—a difficulty the witness recognized.

Ben Owens merely recognized headlights of an approaching car or cars, and testified that when he first saw the headlights they were on the west side of the Boyle intersection, coming east; that he heard the crash and immediately afterwards saw the body strike the white line on Lindell and roll in front of his car; that at the time he heard the crash the automobiles were on the west side of Lindell and Boyle, and that his car was approximately two hundred or two hundred and fifty feet east of that intersection; that he was driving thirty or thirty-five miles per hour, and immediately stopped his car; that he stopped his car in about twenty feet; that the streets were dry; that two automobiles continued east on Lindell and that when he last saw them one was near Vandeventer and the other one was about to Sarah; that in his opinion the car that struck Floyd was traveling approximately sixty miles per hour or better; that the body was placed in his car and taken to Barnes Hospital; that he could not say what type of car struck Floyd; that when Floyd's body quit rolling and came to rest it was about ninety feet east of the east curb of Boyle. On cross-examination he testified that he was driving an Overland coupe at the time; that he did not actually see the man struck and had not even seen the man walking there at the time.

Arnold Bullmer testified that he was a police officer connected with the St. Louis Police Department; that on January 21, 1934, he responded to a call to visit the intersection of Lindell and Boyle; that he arrived there about five-thirty-five A. M., in company with officers Ebinger, Johnson and Koch; that when he arrived he found a crowd of people and Sally Miles, who was very excited; that he did not see the body of Floyd, it having been moved to the hospital; that State's Exhibit K is the headlight of a Ford which he picked up on the south side of Lindell about one hundred and fifty feet east of Boyle, near the curb; that State's Exhibit L is a horn which he found near the headlight, it being painted black, with bracket broken and front flange bent back; that State's Exhibit M is a tire cover, having on it the name "Dr. Pepper," which was also found near by the other articles; that State's Exhibit M was a hood which was found about one hundred and twenty-five feet east of Boyle, near the center of Lindell; that the headlight and the horn were east of the hood cover, and appeared to have rolled towards the gutter, as they were laying downgrade.

William Carr testified that he was a police officer connected with the Secret Service Bureau of the St. Louis Police Department; that

he assisted in the arrest of the defendant; that he saw the defendant in the office of the Chief of Detectives about ten-thirty A. M., January 23rd; that a conversation was had with the defendant concerning the driving of his automobile in the vicinity of Lindell and Boyle on the early morning of January 21st; that no threats or promises of any kind were made to the defendant; that the defendant made a statement at police headquarters at ten-thirty A. M., January 23, in the presence of Chief Carroll, Detective Consedine, William Baer and the witness. "The question was asked him, 'Was he the man that was driving the car on the morning of the 21st at 5:30 A. M., that struck Marsh Floyd?' and he stated that he was;" that William Baer, who was present when this question and answer were given was the defendant's attorney, and that Mr. Baer had surrendered the defendant to the Police Department; that the defendant said that the automobile was in his garage in Kirkwood; that the police got the hood, light and horn and accompanied the defendant to his home in Kirkwood where they pushed the car out of the garage; that the horn and light fit on the defendant's car, which was a 1933 Ford V-8; that the radiator of the car was pushed in, and the hood, light and horn were missing; that State's Exhibit G is a picture taken of the car at that time by a police photographer; that the defendant admitted that the horn, headlight and hood were from his car; that he was asked other questions at police headquarters but that Mr. Baer would not let him answer.

On cross-examination he testified that Mr. Baer had died since the time the statement was alleged to have been made; that the defendant was surrendered to the police department through Mr. Baer, his attorney; that the defendant was questioned by Chief of Detectives Carroll; that the defendant's admission that he was driving the car which struck Floyd was not reduced to writing; that Mr. Baer would not permit the defendant to make any statement, but that the question which the defendant did answer was not reduced to writing and handed to the defendant for signing.

On re-direct examination he testified that they did not prepare a statement for the defendant to sign because Mr. Baer said he could not sign any, and that Mr. Baer said to Chief Carroll, "I will let you ask him one question, Chief: Was he the man that hit the man at Boyle and Lindell. And that is the only question I will let you ask him."

Appellant took the stand in his own behalf, and admitted having driven east on Lindell in the early hours of the day in question. He had been "out" all night, and was on his way home. By way of accounting for the presence of the hood, headlight and horn of his car, at the scene of the tragedy, he testified that about a half a block east of the intersection in question, and while he was proceeding east on

the south side of Lindell, a car swung around him on the left, and pulled directly in front of him; that about the time the other car reached Boyle or perhaps a few feet before, the driver jammed on his brakes very suddenly, whereby appellant's car was caused to crash into and violently collide with the rear end of said car; that the impact drove his radiator back into the fan, cutting the same and throwing a stream of water over the windshield, which prevented him from seeing very well; that he sought to overtake the other car, but by the time he reached Vandeventer, a distance of only a few blocks, he had been outdistanced, and then proceeded on to his home; that he did not see any pedestrian crossing at or near Boyle just before the other automobile swerved in front of his car; that he did not see any man thrown to the ground or in the air by the other car, and that he did strike the body of a man, or any object other than the rear end and tire of the car which had passed him; that before the collision, he was driving about thirty-five miles per hour, and that after he struck the other car, the moter started missing, and he was running on four or five cylinders—slowed him down a good deal; that a man named Freer, of Dayton, Ohio, was with him at the time; that Freer left the car when they reached Vandeventer; that he did so at appellant's suggestion, and for the purpose of taking a taxi to his hotel, all because of the disabled condition of appellant's car; that he did not discover the loss of the missing parts of his car until he got home at Kirkwood.

He denied having made the statement detailed by Officer Carr. His version of that interview was that he was asked such a question, but his attorney said he did not want him to answer; that he was asked if he believed the parts of the car described to him came from his car, to which he replied he thought they did; that that was the only question of that nature he answered.

He detailed certain efforts made to procure the attendance of Freer, but was unsuccessful. In this he was corroborated by the testimony of his attorney. However, he stated he had not had Freer's deposition taken because that was beyond his province. He further testified that the first knowledge he had that a man was involved in the accident he had had at Lindell and Boyle was on Sunday night, when the nine o'clock edition of the Globe carried a story about the police having picked up parts of the car and were searching for the car. He conferred with his lawyer, and thereafter, and on the following Wednesday morning, they went to police headquarters and surrendered.

There was other testimony to the effect that on a 1933 Ford V-8, in looking through only the portion of the windshield cleaned by the wiper, one cannot see the hood on the car while driving; that when the whole windshield is clear, one can only see about six inches or

possibly a foot of the far end of the hood; and that the seat on such a car is very low and that the windshield is very narrow and slants back.

There was testimony given by two witnesses who lived at the hotel at 4315 Lindell, which, if believed, would have warranted the jury in believing that Floyd was at the hotel, and in a highly intoxicated condition for some considerable time before five-thirty A. M. One of the witnesses, Alma McLaughlin, testified she was in and out of Miss Miles' room from two o'clock to five o'clock on the morning in question; that she was waiting for her husband, and Miss Miles was waiting for Floyd; that while so waiting, she was looking out the window and saw someone coming; that Miss Miles said it looked like her friend; that Miss Miles then asked her to leave, and so she returned to her own room before the arrival of Miss Miles' friend; that about a half an hour later Miss Miles' friend left; that she, the witness, went out in the hall where Miss Miles told her that her friend was leaving because he was very much intoxicated; that the witness saw him go to Room 212; and she informed Miss Miles of that fact; that Miss Miles went to Room 212 and came back with her friend, and she did not see Miss Miles' friend after he left the second time. The other witness, Irene Kimmel, testified that Floyd rapped at her door at five o'clock and pushed his way into her room; that he had been drinking, and he remained twenty or thirty minutes, and until Miss Miles came and got him to leave. The testimony of these witnesses was denied by Miss Miles in rebuttal.

I. We have set out the evidence in some detail that it may speak for itself, and so demonstrate there is nothing in the contention that the court should have directed a verdict for appellant at the close of the whole case. The jury was not bound by appellant's explanation. The testimony with respect to the excessive speed of the car, i. e., sixty miles an hour or more on a city boulevard, in the vicinity of a church and hotel, at an early morning hour; that the impact was sufficient to throw deceased a distance of ninety to one hundred and fifty feet; the nature and extent of his injuries; the finding of the several parts of appellant's car, his failure to stop, together with his admission—these, and the other facts and circumstances detailed in the foregoing statement, were sufficient to make a case for the jury, and if believed, as they evidently were, to sustain the verdict.

II. It is next urged that it was reversible error to refuse appellant's requested instruction on circumstantial evidence. If all the evidence in the case on which the State relied was not circumstantial, it was not error to refuse to give a circumstantial evidence instruction. [State v. Shepard, 334 Mo. 423, 67 S. W. (2d) 91.] In the case

at bar, the admission of appellant alone would have been sufficient to justify the refusal of the instruction requested. █ It is also urged the Instruction No. 3 given on the part of the State, erroneously defined culpable negligence, and that under it the jury would have been authorized to convict on a finding of mere carelessness, or ordinary negligence. No such objection was raised by the motion for new trial, the language thereof being: "Because the court erred in giving to the jury, at the conclusion of the whole case instruction numbered 3, same being a misstatement of the law and misdirecting the jury as to the material matters of law necessary for their information, same being argumentative and inconsistent with all of the other instructions given by the court and based upon facts not in evidence, and said instruction assumes the guilt of the defendant." The language is too general to raise the point now urged [Sec. 3735, R. S. 1929; Sec. 3735, Mo. Stat. Ann., p. 3275].

█ III. In the motion for new trial appellant complained of certain argument made by the assistant circuit attorney, in which he characterized two of the witnesses who testified for appellant as women of the street. The ground of the objection was that there was no evidence upon which to base the assertion, and that it was prejudicial. The court sustained the objection, admonished the prosecutor to refrain from further reference to it, and directed the jury to disregard the remark, but declined to declare a mistrial. While the line of argument mentioned is not to be commended, and the court properly sustained the objection, we are not prepared from this distance to say that the court's failure to go further and discharge the jury was reversible error, or error at all. It would seem that in view of the comparatively light sentence imposed, the argument of the prosecutor did not adversely affect appellant, and the rebuke administered was sufficient—particularly does it so appear in the light the exception saved, which went only to the matter of declaring a mistrial.

We have examined the other argument complained of, and find nothing therein which would require a reversal.

The record proper upon examination appears to be regular and sufficient. The judgment ought to be affirmed, and it is so ordered. All concur.