Argued December 2, 1942; affirmed January 19, 1943

STATE *v.* NORTIN

(133 P. (2d) 252)

298

Before KELLY, Chief Justice, and BELT, LUSK and BRAND, Associate Justices.

*Irvin Goodman* and *Leo Levenson,* both of Portland, for appellant.

*Thomas B. Handley,* Deputy District Attorney, of Portland (James R. Bain, District Attorney, and Dan M. Dibble, Deputy District Attorney, both of Portland, on brief), for respondents.

■ BRAND, J. We will first consider whether there was substantial evidence to support the verdict. The court fully instructed the jury on the law of murder in the first degree, murder in the second degree, and voluntary and involuntary manslaughter. The jury found the defendant "guilty of manslaughter" without specifying whether voluntary or involuntary. This general form of verdict was proper if supported by evidence of either voluntary or involuntary manslaughter. *State v. Setsor*, 61 Or. 90, 119 P. 346.

The statute provides:

"In all cases, the defendant may be found guilty of any crime, the commission of which is necessarily included in that with which he is charged in the indictment, or of an attempt to commit such crime." O. C. L. A. 26-948.

Under this statute, all degrees of homicide, including voluntary and involuntary manslaughter, are in the eyes of the law included in the charge of murder in the first degree. *State v. Ellsworth*, 30 Or. 145, 47 P. 199; *State v. Setsor*, (supra); *State v. Farnam*, 82 Or. 211, 161 P. 417, Am. Cas. 1918A, 318. If there was substantial evidence of murder in any degree followed by a verdict of guilty of manslaughter the defendant cannot complain of the denial of his motion for a directed verdict. In *State v. Sing* the defendant was charged with murder in the first degree and was convicted of manslaughter. This court said:

"From the evidence set out above, it will be seen that the charge contained in the indictment is supported by evidence from which the jury could have lawfully convicted the defendant of murder.

"At Section 654, Wharton on Homicide (3 ed.), it is said:

" 'And a verdict for a lower degree of homicide will not be set aside on the ground that the evi-

dence does not make out that degree of the crime in terms as defined by the statute, when it would have supported a finding of a higher degree.'

"Voluntary manslaughter is a crime within the crime of murder charged by the indicment. Upon an indictment for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment and guilty of any degree inferior thereto: Or. L., § 1552. Manslaughter is a degree of criminal homicide." *State v. Sing,* 114 Or. 267, at pp. 283 and 284, 229 P. 921.

■■ Again if there was substantial evidence of manslaughter either voluntary or involuntary followed by a general verdict "guilty of manslaughter" the defendant cannot complain. Our statute, so far as relevant here, provides that if any person, in the commission of an unlawful act or a lawful act without due caution or circumspection involuntarily kills another, such person shall be deemed guilty of manslaughter. O. C. L. A. 23-406, L. 1941, Chap. 439, § 1. Our statute also defines voluntary manslaughter as follows:

"If any person shall, without malice express or implied, and without deliberation, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, voluntarily kill another, such person shall be deemed guilty of manslaughter." O. C. L. A. 23-405.

It appears likely that this section was enacted to make it clear that "irresistible impulse" is not available as a complete defense in this state, although it may reduce the offense to the grade of manslaughter. Manslaughter is not limited to a killing in the sudden heat of passion as defined in the foregoing section, for it is also provided:

"Every other killing of a human being by the act, procurement, or culpable negligence of another, when such killing is not murder in the first or second

degree, or is not justifiable or excusable as provided in this chapter, shall be deemed manslaughter." O. C. L. A. 23-410.

As said in *State v. Butler*:

"But every killing is manslaughter unless it is justifiable or excusable; or is accompanied by malice or deliberation, when it becomes murder in the first or second degree." *State v. Butler*, 96 Or. 219, at p. 235, 186 P. 55.

In *State v. Sing* (supra) where the indictment was for murder, and the conviction was of manslaughter, there was no evidence of passion or of irresistible impulse, but the judgment of conviction was affirmed. In the case of *State v. Silverman*, 148 Or. 298, 36 P. (2d) 342, defendant was charged with murder in the first degree and was convicted of manslaughter. There was no evidence of sudden heat of passion or irresistible impulse, but the judgment of manslaughter was affirmed.

We shall first consider the evidence of involuntary (or negligent) manslaughter. The defendant admits that his mother, Mary Nortin was struck by a bullet fired from a gun in his hands. The defendant testified that on the morning of March 3rd, 1942, he went into the liquor store and got a pint of whisky, after which he went to Walter Beardsley's garage where he took a drink. After remaining there for some time he returned to his home and set the bottle of whisky on the drainboard. Officer Christofferson testified that on the morning of March 4th he interviewed the defendant at the county jail and that at that time, speaking of the morning of March 3rd, the defendant told him:

"I was out pruning trees and fell off about the second rung of the ladder and sprained my arm."

In answer to the question,
"What did you do then?"

the officer testified that he said,
"I went in the house, took a drink of whisky."

Upon further questioning concerning the injury to defendant's arm defendant told the officer that he did not know just when it happened and added that he "had been drinking considerable." The defendant testified that after hurting his foot in the yard he slipped on a rug, thereby injuring his arm. He then looked at the paper for a few minutes after which he "dozed off for probably half or three-quarters of an hour." He testified that after waking from his little "cat-nap",

> "I happened to think what my wife told me in regard to these burglars that had been working throughout the city, called 'the brace and bit burglar.' * * * I saw it in the paper and my wife was telling me, prior to this, I had better get another lock for the garage and fix the one that was on the house,—make things secure. And then we read the paper day in and day out, of course, and I saw in the paper where the Chief of Police, Niles, had put a reward of 100 bucks for anybody who will get that burglar. Now, me not working, 100 bucks looked like a mountain to me at that time, and I says 'Well, if he comes up here, I am sure going to get him.' I took the gun and started to clean it."

The gun, which is in evidence, is a 22 caliber Winchester repeating rifle, commonly called a pump gun. According to the testimony of the defendant, his mother, who was eighty-three years of age, was in her bedroom, which opens off the living room in which

the defendant was seated. The door between the two rooms was six to ten feet distant from the defendant as he sat in a chair by the davenport with his rifle which he says he was preparing to clean. There was no wooden door between the living room and the bedroom. Curtains hung in the doorway but were pulled apart. The defendant testified that he had asked his mother to get the ramrod and a rag from the bathroom. Direct testimony and photographic evidence discloses that after the shooting there was blood upon the floor of the living room about a foot inside of the doorway and that the blood also had dripped on the doorsill at a point about nine inches above the floor. The body, however, lay where it fell, at full length, on its back in the bedroom. A second pool of blood was found upon the floor of the bedroom under the head of the deceased. The jury could have found from the evidence that the deceased had crossed the threshhold from the bedroom and was just inside the living room and within six or at most eight feet of the muzzle of the gun when the shot was fired and that she fell backwards into the bedroom upon being hit. She was struck in approximately the middle of her forehead by a bullet from the gun in the hands of the defendant. Concerning the circumstances of the shooting the defendant testified:

> "Before I done that, I extracted the cylinder from the chamber, the cartridge cylinder here, kicked the rug back—I don't like to spoil those rugs. I shoved the rug back, the proper end, and I set the chair down and set down on it. Then I taken the gun and I dumped the shells out (illustrating), never having a shell in the chamber that I knowed of, but there was one that day. I pulled the hammer back to be sure, and the damn thing went off * * *."

Again, concerning the same occasion, he testified:

"This chair I was sitting in wasn't absolutely over against the davenport. Now, the hammer was at halfcock, like that (illustrating), and you can't pull that from halfcock. I pulled it back and snapped it (snapping trigger), and that caused all this muddle."

He also testified:

"And when I brought the gun back, pulled the trigger back and snapped it (illustrating), and there was a cartridge in there."

The witness was asked:

"Now what do you do when you clean a gun?"

to which he answered:

"A What do I do? I throw the extractor back, put a piece of paper in front of the extractor, light paper, hold it to the light, and you can look right down the barrel. You don't have to tear the gun down unless you are going to permanently clean it, oil it, and everything.

"Q Did you look down the barrel of this gun?

"A This time?

"Q Yes.

"A No, sir."

Examination of the rifle which is in evidence further discloses that upon operating the pump mechanism the breach block is thrown back and the hammer cocked. By this simple operation it is possible to see at a glance whether there is a shell in the firing chamber or if there is none whether one is in a position to be inserted in the chamber by the act of closing the breach block. If he had either looked down the barrel or performed the operation just described he would have known that the gun was loaded or in the process of being loaded. He did neither, but instead cocked the gun and snapped it while the gun was pointed at his

mother's head. If, as he claims, he did not see the deceased until after the shot was fired, the fact would remain that he did not take any action to assure himself that the gun was unloaded and fired it without looking to see at what object it was aimed—fired it at the open doorway of his mother's room through which he had asked and might have expected her to come. We do but assert the obvious in holding that there was substantial evidence of manslaughter even if we view the circumstances in the light most favorable to the defendant.

But the evidence presents a more sinister picture. The deceased had $600 in the bank, $3,000 in bonds and an interest in the home property which the defendant understood would become his when she died. Defendant's wife knew of the bank account of the deceased, and defendant admitted that he knew that she had been receiving some money. The bonds have now been cashed by the executors, one of them being the defendant's wife. Defendant is next of kin to his mother. The evidence discloses that he was abusive toward her, had frequent quarrels and had in the past called her a God damn son-of-a-bitch and told her to shut her ———— mouth, embellishing the command with an epithet too obscene to report. They had quarreled on the Sunday preceding the killing. On the fatal morning, neighbors heard "loud voices like he was angry." This he explained by testifying that he had an argument with his mother "over the fleas." He said, "I wanted to spray the room." She had objected, and the argument lasted "about the same as all the rest of them, about twenty to thirty minutes." Defendant testified as follows:

"Q What did you say to her when you had this argument about the fleas?

"A About the fleas? I told her that this would be a good morning to get those blankets out,—warm, open the windows and air the room out, I wanted to get ready to spray some more of that flea poison. I said, 'There are still fleas in there.'

"Q Well, what was the occasion and when was the time when you said to your mother, 'I will be a son-of-a-B if I can stand for this any more'? Now, when did you tell her that?

"A That was when she said she didn't want the room sprayed.

"Q and how long before the shot was fired did that conversation take place?

"A Oh, that was over an hour. We wasn't arguing just before the shot was fired. * * *"

Concerning his relations with his mother, defendant testified further:

"In our heated discussions what we had, especially in the last two and a half years, year and a half for sure, and maybe a year, along there, at times I have said, 'I will be a son-of-a-bitch if I can stand for all this stuff. You are upsetting my nerves.'"

Later he testified as follows:

"Q In response to the first question Mr. Goodman asked you, you said something about 'the arguments we have.' What is, 'the arguments we have'?

"A Well, it is an argument that runs into pretty hot words; and then often there may be an argument although there was no soreness, that is, my own soreness.

"Q Well, who had the arguments?

"A Well, who else would have it?

"Q You and your Mother?

"A Why, certainly."

Defendant testified that he had been shooting a rifle all of his life "practically" and that a few weeks before March 3rd, 1942 he shot at a burned out electric light

globe "just to see if the gun was working." When the officers arrived upon the night of the tragedy they found the rifle on the floor behind the davenport. They also found ten loaded and two empty shells, the loaded shells being under the rug near the davenport. Of the loaded shells, nine were 22 caliber longs, and one was a 22 caliber long rifle, which shoots a heavier projectile. The nine longs had copper jackets, and the one long rifle had a brass jacket. Of the two empty shells, one with a copper jacket was found under the rug at the opposite end of the room. It was bent when found, having been stepped on. The other empty shell had a brass jacket similar to the long rifle cartridge. Defendant testified concerning the shell with the brass jacket that he didn't know anything about it and added,

"I never saw one of them before that I know of." The discovery of two empty shells led to careful examination of the premises for the purpose of discovering the point of impact of a second shot. The investigation failed to disclose any physical evidence of any second shot. Only one spent bullet was found and that in the brain of the deceased. The only evidence on that significant issue was the discovery of the second empty shell and the following testimony by the defendant:

"Immediately after the first time the gun was fired, I looked at the floor and saw the blood and started * * *".

"Q I understand you to say this occurred immediately after the first shot was fired?

"A I said after the shot was fired. There was only one explosion of the gun. I didn't say the first shot."

The defendant testified that after the shooting he never entered the room where his mother lay, never felt of her pulse, made any attempt to save her life or called for any help. He sat alone in the house until evening when his wife returned. Her testimony is to the effect that he told her that the shooting was accidental, but the character of her testimony was such that the jury might well have questioned her credibility. When asked if the defendant did not make the statement to her that "I shot her. She would not leave me alone, her answer was "well, I don't remember."
She testified, however, that the defendant did not tell her anything about how he accidentally shot his mother and did not say anything about cleaning his gun.

The defendant made inconsistent statements as to the time of the shooting. At some time on the 3rd day of March he had painfully injured his arm and shoulder. At one time he stated that the injury was caused by falling off a ladder in the yard. At another time he stated that he fell in the house causing the injury. Concerning the injury to defendant's arm officer Christofferson testified:

"I so informed him, that he was evidently mistaken on where he got his arm injured. Then is when he told me that he had fallen over the stool in the house there in front of the davenport and that is where he injured his arm. I wanted to know what he was going to do just before he had injured the arm. Well, he said, 'I don't know, we were quarrelling, and this happened during the quarrel.' "

At one time he stated that he was cleaning his gun in preparation for the capture of the brace and bit burglar. At another time he gave the following explanation:

"Q Some testimony has been offered with reference to a conversation that you allegedly had while in

custody, concerning a China rooster. Will you explain what, if anything, you said in that connection? "A It has been three or four different times that Mom saw the rooster up there,—he is a great big, and an old one. And she said, 'I would like to have him in a big pot,' and this probably might have been what I said, when I said—She wanted to know what I was going to do, and I said, 'I am going to get that brace and bit burglar,' or, 'I will shoot a pheasant—' or, 'I will get the pheasant,' is what I said."

In view of the foregoing evidence and much more of similar tenor, it was proper for the trial court to instruct upon the law of murder in both degrees, and there was evidence, though much of it was circumstantial, from which the jury might have found the defendant guilty of murder. It is impossible to know from the form of the verdict whether the defendant was deemed by the jury to be guilty of voluntary or involuntary manslaughter, but upon either theory there was substantial evidence to support the verdict.

The defendant next contends that the court erred in allowing the state as impeachment, over the defendant's objection on rebuttal, to offer testimony of statements alleged to have been made by defendant's wife. Mrs. Nortin testified that she made a statement to Officers Son, Auborn and Stanley on March 5th. She testified further, without objection, as follows:

"Q And I will ask you now whether or not you stated to them in that interview that when you arrived at your home dinner was not ready as usual and Clarence was on the davenport, apparently drunk and in a very nervous and excited state; that you asked what was wrong, and he pleaded with you to get a neighbor to get him some whiskey, and then said to you, 'I shot her. She wouldn't leave me alone,' and that you then walked to the liquor

store at Multnomah and bought a quart of whiskey, at approximately 8:35 P. M., returned and found Clarence in a very remorseful state, saying he would like to do away with himself because of the trouble he had caused you and also because of having to keep his Mother there with you?
"A I don't remember that.
"Q Well, I am asking you whether or not you made that statement?
"A I don't remember. I don't think I did."

On rebuttal the state called officer Son who testified that he and officers Stanley and Auborn were participating in the investigation and that he was instructed to go to Mr. Troutwine's home. It is concerning the alleged statements of Minnie Nortin at the Troutwines' home that the following testimony was given:

"I will ask you this question, Mr. Son: Did you have a conversation with Mrs. Nortin?
"A Yes.
"Q And in that conversation, did Mrs. Nortin state ———".

At this point and before the impeaching question had been asked, counsel for the defense objected, and a colloquy between court and counsel ensued. Before the impeaching question was asked the court suggested that its memory should be refreshed by the reading of the testimony previously given by Mrs. Nortin. The court reporter then read in open court from his notes the exact questions which had been propounded to Mrs. Nortin concerning her alleged statements to the three officers. The notes as read by the reporter disclosed the date of Mrs. Nortin's statement and the persons to whom it was made, together with her answer to the effect that she had made a statement

to Deputy Sheriff Stanley and the two other officers. In the course of the conversation between court and counsel but before the impeaching question had been put, objection was made to the effect that no foundation had been laid therefor. After the reading from the transcript of Mrs. Nortin's testimony, but again before the impeaching question had been put, the defendant again objected. Counsel then for the first time asked the witness Son a specific impeaching question as follows:

"I will ask you this then, officer: Did Mrs. Nortin make this statement to you,—or in words to this effect, that, 'My husband said, "I shot her. She wouldn't leave me alone" '?"

To this specific question no objection was made, and the witness answered, "Yes." After the question had been propounded and the answer given, no motion to strike having been made, counsel for the defense objected on the ground that the prosecution should have specified the time, place and parties present. Counsel for the state responded that he thought he had already done that, to which the court said:

"Well, perhaps it has been lost sight of. If there is any question you had better frame your question properly",

whereupon the following testimony was given without further objection:

"Q You testified that you were on this case along with Lieutenant Stanley and Deputy Sheriff Auborn?

"A That is correct.

"Q And that you had a conversation afterwards with Mrs. Nortin here, the wife of the defendant?

"A Yes sir.

"Q Regarding what took place up there?

"A Yes sir.

"Q And in that conversation that you had with Mrs. Nortin, did Mrs. Nortin state substantially this: that her husband said, 'I shot her; she wouldn't leave me alone'?"

"A Yes, that was her words."

"Q * * * In the same conversation, officer, did Mrs. Nortin state to you substantially as follows: that her husband said, 'I would like to do away with myself because of the trouble I have caused you, also because of having to keep my Mother there with you'?

"A Yes."

In surrebuttal Mrs. Nortin was again called and admitted making a statement at the Troutwine house but testified that it was not made as reported by the officer. From the entire record it is clear that Mrs. Nortin identified the occasion in question, the place where it was made and the persons present and that the testimony of officer Son related to the identical occasion. There was no evidence of more than one interview between Mrs. Nortin and the three officers.

■ The defendant also contends that there was error in receiving impeachment testimony by officer Stanley MacDonald. After reference by the prosecutor to the day after the shooting, which would be March 4th, the following testimony was given by Mrs. Nortin:

"Q And then that morning you talked to Stanley MacDonald, a Deputy Sheriff?

"A Yes.

"Q And made a statement to him. And why at that time didn't you tell him that Clarence said this was done accidentally?

"A Well I was excited. I didn't remember.

At a later time in the same examination, Mrs. Nortin testified:

"Q Now Mrs. Nortin, on the 4th of March,—that would be the morning after this,—1942, you had a conversation with Stanley MacDonald, didn't you,—deputy sheriff?

"A Well, I didn't know who he was at the time.

"Q You saw him on the witness stand today?

"A Yes.

"Q Well, that is the man you had the conversation with. And I will ask you whether or not in that conversation you didn't make this statement to him, that your husband, Clarence, said, 'I had to kill the old lady'?

"A I did not make that remark.

"Q And that Clarence also said, 'I killed her'?

"A I don't remember * * * I did not say that."

Thereafter on rebuttal officer Stanley MacDonald was recalled and gave the following testimony:

"Q I will ask you, Mr. MacDonald, whether or not in the morning of March 4th, 1942, you had a conversation with Mrs. Nortin regarding this shooting?

"A Yes, sir.

"Q And where did that conversation take place?

"A On the 8th floor of the Court House in the Multnomah County Jail, on the morning of March 4th, 1942.

"Q I will ask you whether or not at that time and place Mrs. Nortin, the wife of the defendant, stated to you that her husband told her this, 'I had to kill the old lady'?

"A Yes, sir."

The foregoing testimony was received without objection. In surrebuttal Mrs. Nortin acknowledged making a statement to officer MacDonald but denied that she made the statement as testified by him. The evi-

dence discloses that there was but one conversation between them and that it was identified in the minds of Mrs. Nortin and the impeaching witness, MacDonald.

The testimony of officers Son and MacDonald was appropriate for purposes of impeachment. From appellant's brief we quote the following:

"We are constrained to ask whether Mrs. Nortin made the alleged statement 'On the 8th floor of the Court House, in the Multnomah County Jail, on the morning of March 4, 1942 * * * or as officer Son testified * * *.'"

The answer is clear. There were two statements, one at the County Jail, as testified to by MacDonald, and the other at the Troutwines' home, as testified to by officer Son. Even assuming proper and timely objection had been made, we find no error in the reception of the impeaching testimony.

The statute provides:

"A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the cirstances [circumstances] of times, places, and persons present; and he shall be asked whether he has made such statements, and if so, allowed to explain them. If the statements be in writing, they shall be shown to the witness before any question is put to him concerning them." O. C. L. A. 4-712.

█ Undoubtedly in the interest of fair and orderly procedure counsel who proposes to impeach a witness by showing prior inconsistent statements should follow the common and approved practice indicated by the statute. He should recall the occasion to the witness

and specify the time and place and person or persons present and ask him if he did not make the specific statement concerning which the impeaching witness is expected to testify. Having laid this foundation he should, in examining the impeaching witness, identify the occasion in a similar manner and inquire of him if the witness to be impeached made the statement in question, setting it forth.

 Conceding this to be proper and desirable practice, it does not follow that failure of strict compliance would constitute error. The statute O. C. L. A. 4-712 (supra) is a restatement of the common law rule and bears with it the gloss of common law decisions.

> "Now it is here decided that this section of our code is but declaratory of the common law rule; and in California the same rule is applied and declared in respect to a provision of their code, identical in every particular with out [our] own. (Code of Civil Procedure, sec. 2052; *People v. Devine*, 44 Cal., 457.)
>
> "To ascertain, then, the soundness of the objection under consideration, it becomes necessary to examine what the common law rule is, its purposes, and limitations." *Sheppard v. Yocum*, 10 Or. 402 (1882).

See also *State v. Deal*, 41 Or. 437, at p. 441, 70 P. 532.

The foundation for impeachment of Mrs. Nortin was not laid with the technical accuracy which is desirable, and the same may be said of the questions which were put to the impeaching officer, Son, but Oregon is not among the many states which have held it necessary in all cases to employ the established formula, "as that would be sacrificing a right to a technicality." I Wharton on Criminal Evidence § 483,

p. 998 (10th Ed.) While this court has often referred to the rule as requiring that the cross-examiner in laying the foundation for impeachment should state the time, place and persons present, it has construed the statute, O. C. L. A. 4-712 (supra) as declaratory of the common law and in its application has avoided the inflexible "fetish-formula" adopted in many states but condemned in the following passage from the scholarly pen of Wigmore:

> "A due consideration for these arguments leads to the conclusion that in general the preliminary question should indeed be put, before producing the alleged contradiction; but that this requirement, instead of being rigid and invariable, should be open to exceptions, and should be dispensed with, in the Court's discretion, where the putting of the question has become impossible and the impeaching party has acted in good faith. This sensible form of the rule is, however, in vogue in few jurisdictions only. The modern tendency has been to enforce the rule with inconsiderate and arbitrary rigidity. It is to be hoped that a reaction will some day effect a correction of its rigidity."
>
> "In all but a few jurisdictions the rule is recognized, and is enforced as an inflexible one. In a few jurisdictions its enforcement is left to the trial Court's discretion. In a few others it is not recognized at all."
>
> "If the preliminary question is to be useful as a warning to enable the witness to prepare to disprove the utterance or to explain it away if admitted, it must usually specify some details as to the occasion of the remark. The witness may perhaps without this understand the occasion alluded to; but usually he will not, and in such a case this specification of the details is a mere dictate of justice. The modern tendency of American Courts, however, is to lose sight of the fact that this speci-

fication is a mere means to an end (namely, the end of adequately warning the witness), and to treat it as an inherent requisite, whether the witness really understood the allusion or not. The result of this is that unless the counsel repeats a particular arbitrary formula of question, he loses the use of his evidence, without regard to the substantial adequacy of the warning. Such a practice is impolitic and unjustified by principle. Add to this that the same Court is seldom uniform with itself in the elements of this fetish-formula which it prescribes as indispensable; and it will be seen that the rule on the whole is apt to produce today in its application as much detriment as advantage." III Wigmore on Evidence, (3rd Ed.) pp. 704 to 707.

■ When the specific occasion in question has been called to the attention of the witness to be impeached, and it clearly appears that such occasion is identified in his mind, and he is then asked concerning the specific inconsistent statement with which it is proposed later to impeach him, the purpose of the law has been fulfilled.

In *Oldenburg v. Oregon Sugar Co.*, 39 Or. 564, 65 P. 869, (1901) the witness Caviness was cross-examined as follows:

"When you were constructing that dam did you see Mr. Oldenburg there at that time?"

This was the only specification of time, place or persons present which appears in the foundation for impeachment. The witness answered, "I met Mr. Oldenburg at different times." The impeaching question was then propounded, and the witness answered, "No, sir * * * I said this * * *." Oldenburg was then called as an impeaching witness, and again the

only specification of time, place and persons present was as follows:

"At the time Mr. Caviness was constructing that dam across the Grande Ronde River, I will get you to state if * * *."

Then followed the impeaching question. Oldenburg testified that Caviness made the statement in question. The Court said:

"Caviness having acknowledged that he remembered the circumstances of time and place and the conversation to which his attention was called, there was no necessity for laying a broader foundation, the only object of which is to enable the witness to refresh his memory in respect to the matter to which his attention is called, and to allow him an opportunity to explain it."

In *State v. Deal* (supra) the witness was asked:

"Q Do you remember of meeting Mr. Brewer on the Foothill road along near the Shambaugh place some time last May?
"A Last fall.
"Q About last April?
"A No, sir.
"Q Don't remember meeting him there?
"A No, sir."

The impeaching question was then put to the witness, and he answered:

"No, sir. I remember about riding along with him. But it seems like it was last fall."

The witness, however, admitted that he was at the place at one time. The court refused to permit Brewer to testify as an impeaching witness on the ground that no foundation had been laid. Upon appeal, this court,

by Justice WOLVERTON, cited the statute (supra) and said:

"This is but declaratory of the common-law rule, and the purpose of requiring the observance of the formality prescribed is for the protection of the witness, to give him an opportunity of recalling the facts and correcting the statements when immediately brought to his attention. When, however, the statements are called to his mind, together with such circumstances of time, place, and persons present as to enable him to readily understand the particular statements alluded to by the questioner, and he then denies making any, or attempts to qualify them, other persons having knowledge of the fact may be called to contradict him: Sheppard v. Yocum, 10 Or. 402; State v. Welch, 33 Or. 33 (54 Pac. 213); State v. Bartmess, 33 Or. 110 (54 Pac. 167). Now, as it pertains to the statement or admission made to Brewer, Rowland denied it *in toto*. He recalls, however, that he was with Brewer at the place designated, but is not certain as to the time, thought it was in the fall; and that another person, one Hornbeck, was also present."

The court said, "We think the foundation was well laid, for the impeachment by the testimony of the witness Brewer * * *." Concerning another attempted impeachment, the court said, "The attempted impeachment by Cleve Hopper has, perhaps, not so good a basis," but it was held that the trial court erred in excluding the impeaching testimony in both instances, and the case was reversed.

In the following cases, the foundation for impeachment has been held sufficient, although deficient in one or more of the statutory requirements: *Dillard v. Olalla Mining Co.*, 52 Or. 126, 94 P. 966, 96 P. 678 (1908) (time); *State v. Welch*, 33 Or. 33, 54 P. 213 (1898)

(place); *Sheppard v. Yocum,* 10 Or. 402 (1882); *State v. Ellsworth,* 30 Or. 145, 47 P. 199 (1896); *State v. Bartmess,* 33 Or. 110, 54 P. 167 (1898) (persons present); *State v. Sing,* 114 Or. 267, 229 P. 921 (1924) (immaterial variance between impeaching question and impeaching evidence).

The liberal character of the rule is made manifest in the following excerpts:

"The name of the person to whom the remark was made is not given, but that, if unknown to counsel, could be of little consequence, if the circumstances were detailed with that degree of particularity that necessarily called attention to the language or act complained of, and revived them in the memory of the witness." *State v. Ellsworth* (supra).

"It is said in Jones' Commentaries on Evidence, Section 846:

" 'Although the attention of the witness should be called to the time of the alleged statement, exact precision in this regard is not necessary. It suffices if there is reasonable certainty, or if it is clear that the attention of the witness is called to the conversation in such manner that it is identified by him. * * On the same principle, if the question designates the person or the place with reasonable certainty, it is sufficient. * * The object of these requirements is to give the witness proposed to be impeached by showing statements out of court contrary to what he has testified to at the trial a fair opportunity to recollect and explain his former statements if he made any. While it is usual and important, whenever practicable, to give the exact terms of the proposed contradictory statement, it is not a fatal objection to the testimony if the variance between the statement as set forth in the question and as given in the answer is not such as to make the two statements substantially different'." (Quoted with approval in *State v. Sing* (supra.) )

See also *State v. Deal* (supra); *State v. Patrick,* 131 Or. 209, 282 P. 233 (1929); *Ritchie v. Pittman,* 144 Or. 228, 24 P. (2d) 328 (1933). In fact, there is reason and authority supporting the views of Professor Wigmore to the effect that the sufficiency of the foundation for impeachment should be a question addressed to the sound discretion of the trial judge.

"Whether the time, place and person have been sufficiently specified is for the determination of the trial court in the exercise of a sound discretion." 70 C. J. § 1288, p. 1111, citing *State v. Patrick* (supra), wherein it is said:

"The sufficiency of the foundation for impeachment is to be determined by the trial judge."

"The specification of time, place, and person is required merely to insure fairness and as a means of adequately warning the witness so as to afford him reasonable opportunity for explanation. It is for the trial court, in the exercise of sound discretion to determine whether this has been done in the particular case. State v. Glynn, 51 Vt. 577, 579; 2 Wig. on Ev. § 1029. It was said in the case cited that to insure fair dealing some witnesses would require the protection thus afforded, while with others it would be needless." *Niebyski v. Welcome,* 93 Vt. 418, 108 A. 341, and see *In re Waterman's Will,* 102 Vt. 443, 150 A. 65, and *The Charles Morgan,* 115 U. S. 69 (1884), 5 S. Ct. 1172, 29 L. Ed. 316.

The only cases coming to our attention in which this court has held that the trial court committed error in receiving impeaching evidence without adequate foundation are as follows: *State v. Hunsaker,* 16 Or. 497, 19 P. 605 (1888) and *Coles v. Harsch,* 129 Or. 11, 276 P. 248 (1929). In neither case had the cross-examiner laid any semblance of a foundation for impeachment.

No error was committed in receiving the impeaching testimony.

The final assignment of error is the refusal of the court to give defendant's requested instruction, which was as follows:

"You are instructed that if, from a consideration of all the evidence in the case, the same is susceptible to two conclusions, or two constructions, one consistent with the guilt of the defendant, and the other consistent with his innocence, then I instruct you to adopt the construction or conclusion which is most favorable to the defendant."

The instruction requested is typical of those frequently given in circumstantial evidence cases, but if, under the circumstances of this case, no instruction on the law of circumstantial evidence was necessary, the defendant cannot complain of the court's refusal to instruct as requested.

A very similar instruction was requested and refused by the trial court in the case of *State v. Quartier.* The court said:

"Since the state's evidence consisted of both direct and circumstantial evidence, this requested instruction went too far. Under the doctrine announced in State v. Holbrook, 98 Or. 43 (192 Pac. 640, 193 Pac. 434), it is not proper to give such an instruction in any case where there is direct testimony of the commission of the crime, since the effect of such an instruction is to direct the jury to disregard the direct evidence in the case." *State v. Quartier,* 118 Or. 637, 247 P. 783 (1926).

In *State v. Nutter,* 119 Or. 341, 249 P. 635 (1926), the defendant on appeal complained of the refusal to give a similar instruction, but this court said,

"The defendant was not tried nor convicted upon circumstantial evidence alone."

It also appeared that the subject matter had been covered in another instruction.

In *State v. Holbrook,* error was asserted by reason of the refusal of the court to give an instruction upon circumstantial evidence as requested by the defendant. The first portion of the requested instruction was as follows:

"In this case some of the conclusions sought to be established by the state depend upon what is known in law as circumstantial evidence."

Then followed a lengthy instruction on the law of circumstantial evidence. The court said:

"By the great weight of authority the doctrine of the cases is that an instruction on circumstantial evidence, such as the defense propounded in the instant case, is proper only when the prosecution relies exclusively on that class of testimony. On the other hand, if there is any direct testimony respecting the corpus delicti, an instruction on circumstantial evidence is properly refused. To give such a direction, where direct testimony is in the record, would tend largely, in effect, towards saying to the jury:

" 'You may lay aside for the present all direct testimony respecting the crime charged, take up the circumstantial evidence, and, if you find that no other reasonable conclusion than the guilt of the defendant can be derived from such circumstantial evidence, you may find him guilty; otherwise, you must acquit him.' "

Upon rehearing the court again said:

"The point sought to be made by the defendant Paddock is that there was no direct evidence against him, and that therefore his substantial rights were materially prejudiced by the refusal of the trial court to instruct the jury on the subject of circum-

stantial evidence. As we view the record, the case against Paddock was not entirely dependent upon circumstantial evidence, but upon the contrary there was direct testimony given by the two witnesses, Santiago and Garcia * * *." *State v. Holbrook,* 98 Or. 43, 188 P. 947, 192 P. 640, 193 P. 434 (1920).

 The rule to be deduced from our decisions is that when all or substantially all of the evidence tending toward conviction is circumstantial, the court should, upon request, instruct on the law relating to such evidence, but where there is substantial direct evidence of guilt it is not necessarily reversible error to refuse to instruct on the law of circumstantial evidence. Upon the facts of a particular case it may be proper although not necessary. If such an instruction were given in a case supported by both circumstantial and direct evidence, it would be in the nature of a cautionary instruction, the giving or refusing of which is generally considered to rest in the sound discretion of the trial court.

While the decisions of other jurisdictions are not uniform, the foregoing statement of the law is supported by weighty authority. In *State v. Tucker,* it was said:

"It is next urged that it was reversible error to refuse appellant's requested instruction on circumstantial evidence. If all the evidence in the case on which the state relied was not circumstantial, it was not error to refuse to give a circumstantial evidence instruction. State v. Shepard, 334 Mo. 423, 67 S. W. (2d) 91. In the case at bar, the admission of appellant alone would have been sufficient to justify the refusal of the instruction requested." *State v. Tucker,* 339 Mo. 101, 96 S. W. (2d) 21.

See also *Owen v. State,* 93 Tex. Cr. 145, 245 S. W. 704; *Bowen v. State,* 181 Ga. 427, 182 S. E. 510; *Ossendorf v. U. S.,* 272 F. 257; *State v. Criger* (Mo.) 46 S. W. (2d) 537.

█ It is well established that it is not necessary to have direct evidence on every material issue in the case in order to obviate the necessity for instructing on circumstantial evidence. In the Oregon case of *State v. Nutter* (supra) the defendant was convicted of the crime of manufacturing intoxicating liquor. There was direct evidence that

"* * * at the time and place in question, some person was unlawfully engaged in the manufacture of intoxicating liquor. The prosecution sought to show by circumstantial evidence that the defendant was that person."

Yet the court strongly indicated that no instruction on circumstantial evidence was required. In *Davis v. State,* the defendant was convicted of burglary. He admitted breaking and entering, but there was only circumstantial evidence that the entry was made at night. In this situation the defendant on appeal contended that the court erred in refusing to instruct on the law of circumstantial evidence. The court said:

"A case may be said to be on circumstantial evidence when all those facts necessary to make out a case under the law are deducible as inferences from proof of other facts. It cannot be said, when there is direct proof of most of the main facts showing guilt, that, because the state must prove some one or more facts by circumstantial evidence, the case is nevertheless one dependent wholly on that character of testimony so as to make it the duty of the court to so charge the jury." *Davis v. State,* 107 Tex. Cr. 134, 295 S. W. 608 (1927).

Motive and intent may constitute a material element in a criminal charge. These are issues relative to mental condition as to which direct testimony is often impossible. It is rightly held

> "* * * that an instruction on circumstantial evidence is not necessary where the circumstances in evidence are introduced only for the purpose of corroboration; or only to show motive; or where the only question to be determined by the jury is that of intent; or venue; or where the evidence, even though circumstantial, is full and satisfactory, without serious conflict, and clearly shows the guilt of accused." 23 C. J. S. p. 813, § 1250.

It remains only to determine what types of evidence are deemed to be direct as distinguished from circumstantial within the meaning of the rule as stated above. Admissions or confessions made out of court are held to be direct evidence, and when the prosecution advances such evidence it is said to be unnecessary to instruct on the law of circumstantial evidence. *State v. Criger* (supra); *Strickland v. State,* 167 Ga. 452, 145 S. E. 879 (1928); *Bell v. State* (Tex. Cr.) 104 S. W. (2d) 511 (1937); *Wylie v. State,* 106 Tex. Cr. 95, 291 S. W. 233 (1927); *Harris v. State,* 152 Ga. 193, 108 S. E. 777 (1921); *Moon v. State,* 146 Tenn. 319, 242 S. W. 39 (1922); *State v. Tucker* (supra).

> "Direct evidence of a killing is the evidence of an eyewitness that it was committed. This includes in criminal law the confessions and admissions of the accused." Underhill on Criminal Evidence, 4th Ed. § 4.

> "And in Randall, Instructions to Juries § 228, the following is stated:

> " 'A confession or admission by the defendant of actual participation in the act charged against him

as a criminal offense constitutes direct evidence of guilt. In accordance with the rule stated above, therefore, where there is evidence of such a confession or admission, the court will not be required to charge on circumstantial evidence.' '' *Evans v. State,* 199 Ind. 55, 155 N. E. 203.

See also Randall, Instructions to Juries, § 227.

■ It is unnecessary at this time to go so far. The state does not rely strongly upon any admissions of the defendant made out of court, and it is unnecessary to decide whether such admissions are to be deemed direct or circumstantial evidence. In this case the bulk of incriminating evidence comes from the testimony of the defendant as a witness at the trial. If a third person had been present and, having seen and heard all concerning which the defendant testified, had narrated the same to the jury, we think no one would have the hardihood to claim that there was any want of direct evidence substantially tending toward conviction. Defendant himself was an eye-witness to the tragedy. He testified directly to the fact of the killing and also to facts which at best showed negligence and at worst disclosed voluntary homicide in the course of a quarrel. He cannot be heard to assert that evidence which would be direct and substantial if given by another is merely circumstantial if given by him.

In *Burns v. State,* 22 Okla. Cr. 151, 210 P. 302, it is said:

"It is first contended that the trial court erred in refusing to give a requested instruction on the law relative to circumstantial evidence. In the case of Foster v. State, 8 Okl. Cr. 139, 126 Pac. 835, it is held:

" 'In a murder case, where the defendant admits the killing, or where there is direct evidence that the defendant killed the deceased, a charge on circumstantial evidence should not be given.'

"In view of the fact that the defendant admitted the killing in this case, an instruction on circumstantial evidence was not required. It was no error, therefore, to refuse to give a requested instruction on that subject."

In *Hollingsworth v. State*, 50 Okla. Cr. 164, 297 P. 301, the court said:

"Defendant next contends that the court erred in failing to instruct the jury on circumstantial evidence.

"The defendant was sworn and, testifying for himself, admitted the homicide and sought to justify the same on the ground of self defense. In such a case no instruction on circumstantial evidence is necessary."

In *State v. McKnight*, it was held:

" "As pointed out by the Attorney General, the state first proceeded under the necessity of establishing a case against the defendants by circumstantial evidence. When the defendants, however, took the stand as witnesses, the circumstantial aspect of the case disappeared, the homicide being admitted by the defendants, who proceeded upon the theory of self-defense and sought to justify thereby the act of homicide. Had the case been purely one of circumstantial evidence, the position of the appellant in this connection would be a proper one. But as pointed out, the facts of the case do not bring it within the rule contended for. The law is, we believe, as stated by Underhill on Criminal Evidence § 6 as follows:

" 'Where the only incriminating evidence before the jury is circumstantial, it is the duty of the

court to instruct upon the rules of law regulating circumstantial evidence. But if there is any direct evidence tending to show the prisoner's guilt, or if a confession made by him has been proved, such an instruction is unnecessary.' " *State v. McKnight,* 21 N. M. 14, 153 P. 76, (1915).

The court did not err in refusing to give the requested instruction. It should be added that the court did advise the jury that circumstantial evidence to be sufficient for a conviction must be of a strong and conclusive nature and that each fact necessary to the conclusion sought to be established must be proved by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

Finding no reversible error the conviction is affirmed.